IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL ZIEGLER and KIM DENKEWALTER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:20-cv-5013 |
| | ) | |
| FREEDOM DEVELOPMENT GROUP, LLC, an | ) | JURY DEMANDED |
| Illinois limited liability company; JET PARK, LLC, | ) | |
| an Illinois limited liability company; 901 CENTER | ) | |
| STREET HOLDINGS LLC, an Illinois limited | ) | |
| liability company; JET HOSPITALS LLC, a | ) | |
| terminated Illinois limited liability company; STAR | ) | |
| REAL ESTATE, LLC, a former Illinois limited | ) | |
| liability company; JOHN THOMAS, individually; | ) | |
| and DANIEL OLSWANG, individually, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

MICHAEL ZIEGLER and KIM DENKEWALTER, collectively "Plaintiffs," by their

attorney, Gregg Minkow of Minkow & Bergman, LLC, complain of FREEDOM

DEVELOPMENT GROUP, LLC, JET PARK, LLC, 901 CENTER STREET HOLDINGS LLC,

JET HOSPITALS LLC, STAR REAL ESTATE, LLC, JOHN THOMAS, individually, and

DANIEL OLSWANG, individually, collectively "Defendants," stating as follows, with all

Counts hereof pled in the alternative:

## JURISDICTION AND VENUE

1.      This is a civil action arising under the federal Racketeer Influenced and Corrupt

Organizations Act ("RICO"), at 18 U.S.C. § 1962, for a pattern of conduct using wire

communications in interstate commerce to defraud lenders, service providers, and business

associates out of funds loaned and entrusted to them, and property interests to which they were

entitled, and diverting such funds and interests to their own use surreptitiously, in repeated

violation of 18 U.S.C. § 1343 (the "Wire Fraud Statute").

2.      Relief is also sought in the alternative under state common law for breach of fiduciary duty, fraudulent misrepresentation, constructive fraud, and breach of contract.

3.      The Court has original jurisdiction of the federal claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

4.      Since the state law claims derive substantially from a common nucleus of operative fact as the federal claims, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper under 28 U.S.C. § 1391(b)(1) and (2).

## DESCRIPTION OF THE PARTIES

6.      MICHAEL ZIEGLER ("Ziegler") was at all relevant times, and is currently, a resident of the Village of Glenview, in Cook County, Illinois.

7.      KIM DENKEWALTER ("Denkewalter") was at all relevant times, and is currently, a resident of the City of Wheeling, in Cook County, Illinois, and is licensed to practice law in Illinois.

8.      FREEDOM DEVELOPMENT GROUP, LLC ("FDG") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on May 22, 2017, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607.

9.      JET PARK, LLC ("JET Park") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on November 2, 2017, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607.

10.     901 CENTER STREET HOLDINGS LLC ("901 Center") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on August

28, 2019, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607.

11.     JET HOSPITALS LLC ("JET Hospitals") was at all relevant times, and is

currently, a limited liability company formed under the laws of the State of Illinois on April 14,

2020, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607.

12.     STAR REAL ESTATE, LLC ("Star Realty") was at all relevant times a limited

liability company formed under the laws of the State of Illinois on July 3, 2013, with its principal

office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, whose status is listed by the

Illinois Secretary of State as "terminated" on September 4, 2019.

13.     JOHN THOMAS ("Thomas") was at all relevant times, and is presently, a resident

of the State of Illinois, working regularly from offices at 910 W. Van Buren, Suite 500, Chicago,

Illinois 60607.

14.     DANIEL OLSWANG ("Olswang") was at all relevant times, and is presently, a

resident of the State of Illinois, working regularly from offices at 910 W. Van Buren, Suite 500,

Chicago, Illinois 60607, and is licensed to practice law in Illinois.

15.     At all relevant times, JET Park was a mere alter ego of FDG, formed by FDG's

owners as FDG's designated vehicle for the purchase and resale of certain Minnesota real estate

described below and referred to as the "Parking Ramp."[1]

16.     At all relevant times, 901 Center was a mere alter ego of FDG, formed by FDG's

owners as FDG's designated vehicle for the purchase and operation of certain Illinois real estate

which had previously been the site of Sherman Hospital in Elgin, Illinois.  The site was

designated earlier this year for use as a COVID-19 treatment center by the State of Illinois, and

---

[1]  The name of the company is derived from the name of Defendant Thomas: "JET" are Thomas'
initials.

on information and belief, various government agencies invested $18 million to improve and outfit the site for the aforementioned use.

17.     At all relevant times, JET Hospitals was a mere alter ego of FDG, formed by FDG's owners as FDG's designated vehicle for the purchase and operation of certain Illinois real estate which had previously been the site of Westlake Hospital in Melrose Park, Illinois.  The site was designated earlier this year for use as a COVID-19 treatment center by the State of Illinois, and JET Hospitals seeks to purchase the site and lease it to the State of Illinois by way of a Court-ordered sale in the United States Bankruptcy Court for the Northern District of Illinois, Case No. 19 B 22878.

18.     At all relevant times, Star Realty was a mere alter ego of FDG, formed by FDG's owners for the purpose of brokering commercial real estate sales.

19.     Since the inception of FDG and JET Park, respectively, Thomas (or a trust controlled by him) has been directly or indirectly the majority-owning Member of those companies.

20.     Since on or before October 18, 2018, Olswang has been the Registered Agent of both FDG and JET Park, at its above-shown principal office in Chicago, and on information and belief, Olswang has been functioning as President of those companies since on or before that date.

21.     Since their formation, Olswang has also been the Registered Agent of both 901 Center and JET Hospitals, at their above-shown principal office in Chicago.

22.     Since on or before June 23, 2019, Olswang was also the Registered Agent of Star Realty, at its above-shown principal office in Chicago.

23.     Thus, FDG, JET Park, 901 Center, JET Hospitals, and Star Realty all had the

same principal office and the same registered agent at all times relevant hereto.

24.     Since on or before March 29, 2019, Thomas and Olswang have been the sole Managers of FDG.

25.     Since on or before October 17, 2019, Thomas and Olswang have been the sole Managers of JET Park.

26.     On information and belief, since its formation, Olswang has been one of the two Managers of 901 Center, but Thomas has held a significant ownership interest therein and has exercised either a significant role or a controlling role in the management thereof.

27.     On information and belief, since its formation, Thomas has been the sole Manager of JET Hospitals.

28.     Since on or before June 23, 2019, Olswang was the sole manager of Star Realty, but on information and belief, since on or about September 13, 2018, 70% of the Membership Interests in Star Realty was owned by some combination of Olswang and the Cast Iron Trust, which on information and belief is either a fictitious name in which Thomas held ownership of Star Realty or was a trust of which Thomas was directly or indirectly the primary beneficiary.

29.     Consequently, on information and belief, at all relevant times, all the company Defendants in this suit were under the common ownership and control of Thomas and Olswang, and JET Park, 901 Center, JET Hospitals, and Star Realty were all under common ownership and control with FDG.

30.     Moreover, in a combination of public interviews and FDG's website, FDG was presented as the central entity directing the other Defendant businesses.

31.     From the formation of FDG on May 22, 2017 until on or about August 2, 2018 (formalized in writing on or about September 13, 2018), Denkewalter was a Manager and

minority-owning Member of FDG. On or about September 13, 2018, Denkewalter resigned as Manager of FDG, and relinquished all but a 2% Membership Interest in FDG, a 30% Membership Interest in Star Realty, and 2.5% of FDG's interest in Questar, Inc., pursuant to a written agreement with FDG, signed by Thomas on FDG's behalf.

## CORE FACTS

### Loan from Ziegler for Earnest Money to Facilitate FDG/JET Park Real Estate Purchase

32.     In January, 2018, prior to the 25th day of that month, Denkewalter, Ziegler, Thomas, and Rick DiMaria, a sometime fundraiser for Thomas and his projects, met at Hackney's restaurant on Lake Avenue in Glenview, Illinois, to discuss the possibility that Ziegler, a longtime friend and sometime legal services client of Denkewalter, might loan FDG the sum of $250,000.00.00 to be used as the earnest money for FDG's planned purchase, directly or through an intermediary company which FDG's owners had formed (*i.e.*, JET Park), a commercial parking garage property in St. Paul, Minnesota known as the RiverCentre Parking Ramp (the "Parking Ramp").

33.     At the meeting, Thomas described his past development experience, and his plan for the purchase of the Parking Ramp.

34.     At the meeting, Thomas also told Ziegler that Thomas already had buyers lined up to purchase the Parking Ramp from FDG on a resale or "flip" after FDG procured the property.

35.     At the meeting, Ziegler and Thomas agreed that Ziegler would loan FDG the $250,000.00.00, to be used solely for earnest money on FDG's procurement of the Parking Ramp, in exchange for repayment when the "flip" was completed, along with interest at the rate of 2.4% per year (payable every February), a preferred right to receive the first $250,000.00 as

an additional return on his loan, and 10% of any profit received by FDG in excess of $4 million through the purchase and resale or flip of the Parking Ramp.

36.     Shortly after the meeting, the terms of the loan were memorialized in a document entitled "Unsecured Promissory Note," attached hereto as **Exh. 1**, which Denkewalter signed on FDG's behalf, pursuant to Thomas' direction as majority owner, on January 25, 2018.

37.     On January 25, 2018, Ziegler transferred the $250,000.00 amount to the attorney trust account of Denkewalter's law firm, Denkewalter & Angelo (also known as an "IOLTA account"), and Denkewalter promptly thereafter transferred the funds to an account held by Old Republic National Title Insurance Company ("Old Republic") as the escrow agent for FDG's purchase of the Parking Ramp from its owner, the Port Authority of the City of St. Paul (the "Port Authority").

### Difficulties Encountered In Consummating the Purchase of the Real Estate

38.     In the course of efforts to consummate the purchase of the Parking Ramp, FDG discovered that impediments might exist to the company obtaining good title as a result of such a purchase.

39.     Specifically, certain holders of bonds issued by the Port Authority contended they had a right to accelerated repayment of the bond debt, or an assumption of the Port Authority's debt obligation by the purchaser, in the event the Parking Ramp were sold. Concurrently, another party claimed it had a purchase option and right of first refusal to buy the Parking Ramp in place of a third-party prospective buyer like FDG.

40.     In an effort to save the proposed sale to FDG, the Port Authority took the position that from a legal standpoint, the transaction with FDG/JET Park – structured as a deed in lieu of foreclosure on the bonds, and an assignment of rights to JET Park by the deed-in-lieu

recipient – would not comprise a "sale" within the meaning of the Port Authority's agreements with the bondholders and purported optionee.

41.     The matter went to litigation, and initially, the Hennepin County District Court dismissed the claims of the bondholders and purported optionee.

42.     However, on October 28, 2019, the Minnesota Court of Appeals reversed the Hennepin County District Court's dismissal of the bondholder and purported optionee claims, in an opinion attached as **Exh. 2**.

**Termination of the Proposed FDG/JET Park Purchase of the Real Estate**

43.     Following the Minnesota Appellate Court's decision, the Port Authority decided not to sell the Parking Ramp to anyone for the time being, but instead to retain ownership of the property and solicit bids from would-be partners or tenants to re-develop the property for the purpose of generating greater revenues.

44.     As a result, the contract between the Port Authority and JET Park was terminated, and at some point in November 2019, Old Republic returned the earnest money to either FDG, JET Park, or persons then in control of those entities.

**Withholding of Monies, Misuse of Credit Facilities, and Withholding of Information By FDG, Thomas, and/or Olswang**

45.     As noted above, by the time the purchase contract was terminated, Thomas and Olswang had long been the sole Managers of both FDG and JET Park.

46.     Denkewalter had ceased being a Manager of FDG and JET Park a year earlier, pursuant to an agreement entered into by Denkewalter and FDG, attached hereto as **Exh. 3**.

47.     Consequently, after September 13, 2018, Denkewalter had no knowledge of the progress of attempts to purchase the Parking Ramp, or of any other FDG or JET Park purchases or sales, except what he could elicit from Thomas, Olswang, or Old Republic.

48. During negotiations for the exit agreement (Exh. 3), Denkewalter expressed interest in making sure Ziegler's loan money was being protected.

49. During those negotiations, Thomas explicitly told Denkewalter that in the event the purchase of the Parking Ramp was not consummated, Ziegler's loan principal would be promptly returned to the Denkewalter IOLTA account from which it had been transferred to Old Republic.

50. Indeed, during the negotiations with Denkewalter in August-September 2018, Thomas confirmed in writing the above representation regarding the return of Ziegler's funds, when he hand-wrote an outline for use in drafting what would become Exh. 3. This outline, in Thomas' handwriting, is attached hereto as **Exh. 4** (*see* the phrase "Kim's IOLTA" in lower righthand corner, with line connecting it to the phrase "200 + 250 to close – Mike Ziegler").

51. Moreover, ¶ 4 of Exh. 3's internal Exh. A expressly provided for moneys due Ziegler upon the flip of the Parking Ramp – in the same amounts specified in the Promissory Note to Ziegler (Exh. 1), except for the contingent profits percentage – to be paid to the Denkewalter & Angelo IOLTA account for Ziegler's benefit.

52. Thus, Thomas and Olswang at all times were well aware of FDG's obligations under the Promissory Note to Ziegler (Exh. 1). However, they allowed FDG to default on the interest payment due in February 2019 after Denkewalter's departure as a Manager.

53. Concurrently, Thomas and Olswang allowed FDG to default on its obligations to Denkewalter under his own agreement (Exh. 3), by missing the $250,000.00 payment that was due him no later than March 31, 2019 under ¶ 3 of Exh. A to that agreement.

54. Meanwhile, Thomas and/or Olswang surreptitiously used American Express and Discover credit cards in Denkewalter's name – after his departure as a Manager – to run up

9

significant debts for FDG business expenses as well as meals, ridesharing, and other living

expenses, including expenses of Thomas' then girlfriend, creating $84,594.22 in charges to

Denkewalter's American Express credit card (the bills for which were sent to FDG's address in

Chicago, and were thus unknown to Denkewalter until well after they were incurred) plus

$4,086.15 in charges to his Discover credit card, including interest and late fees, which the

credit card issuers have demanded from Denkewalter.

56. When Denkewalter tried to obtain information and procure the honoring of

Ziegler's rights as well as his own, Thomas and Olswang accused him of "harassment," and

repeatedly rebuffed his inquiries.

56. Thus, for example, Thomas sent Denkewalter the email attached as **Exh. 5** on

February 22, 2019, acknowledging to Denkewalter that Ziegler ("your investor") was owed

performance, and stating that Olswang (copied on the email) would be the point of contact, but

instructing Denkewalter to "Stop sending emails and calling which is just disrupting everyone."

57. Further, on July 18, 2019, Olswang wrote to Denkewalter (in **Exh. 6**, bottom

half) that the controversy over the Port Authority's ability to deliver clear title to the Parking

Ramp and consummate FDG/JET Park's purchase was still unresolved, but warned, "Constantly

calling our office and harassing the staff is not appreciated."

58. Denkewalter responded the next day (Exh. 6, top half) by denying any

harassment, and explicitly pointing out,

> "Mike Ziegler is due interest on his note. Get that paid. John promised him and
> the note also shows it. You have a copy of the Note as it was in the boxes we
> turned over. I also sent Bobby [FDG's tax preparer] a copy since you and John
> refuse to accept my calls."

Still, however, Ziegler's interest was not paid.

59. On August 1, 2019, Denkewalter wrote again to Thomas and Olswang,

requesting copies of tax returns for FDG and an affiliate so that he could complete his personal tax returns. In that email (**Exh. 7**), Denkewalter also asked "Is anything happening on PARKING RAMP or building?", making reference to both the Parking Ramp and another Minnesota property, the former "Ecolab" building, which FDG purchased and for which it owed Denkewalter a payment under ¶ 2 of Exh. A to his exit agreement (Exh. 3 hereto), upon its sale. Denkewalter did not receive an answer from either Thomas or Olswang, or anyone else at FDG or JET Park.

60.     On August 8, 2019 (in **Exh. 8**, bottom half), Denkewalter again inquired what was happening in Minnesota. The next day, Olswang responded (in Exh. 8, top half), "Zero update on Minnesota. Still cant [sic] close because of Mr. Rupp."

61.     On September 12, 2019, Denkewalter again wrote to Thomas and Olswang (in **Exh. 9**), stating in part, "Any word on St. Paul?", and "Congrats on buying Sherman Hospital. Now how about paying your bills." Thomas and Olswang did not respond.

62.     On September 18, 2019 (in **Exh. 10**), Denkewalter again wrote to Thomas and Olswang, stating in part, "Anything happening in St. Paul? Is Mike's [Ziegler's] money still with the title company? If not/ where is it? I would appreciate a response."

63.     At all times, Thomas and Olswang knew Denkewalter was inquiring about Ziegler's funds on Ziegler's behalf, and that Ziegler would be looking to Denkewalter for information from FDG about his funds.

64.     On December 3, 2019, Denkewalter wrote to Thomas and Olswang (in **Exh. 11**), "Dan and John, Please give me an update for the pending sale. I have to report to Mike's [Ziegler's] divorce attorney. Please get back to me ASAP. Thank you, Kim."

65.     On December 4, 2019, when Denkewalter did not receive a response from

Thomas and Olswang, he attempted to find out from Old Republic the status of the attempt to purchase the Parking Ramp. Although Old Republic refused to give Denkewalter many details, a representative did inform Denkewalter that the purchase contract had been terminated, and that the earnest money had been returned to unspecified persons.

66.     Consequently, on December 4, 2019, Denkewalter wrote to Thomas and Olswang (in **Exh. 12**), starting as follows: "Please advise how I can get the Zeigler [sic] deposit this week. I understand that the contract was terminated last month. I would have thought you would contact me. Please don't tell me you have misappropriated the Zeigler funds."

67.     Olswang responded to Exh. 12 with the following (in **Exh. 13**, bottom of page 1, carrying on to page 2):

> "Kim, it is not our intention to have a big fight. We would like to sit down with you and work out everything globally. Are you available to meet on December 17th or 18th? The three of us can sit down and work through things. Also, can you please send me a copy of the note. I looked everywhere and cannot locate it. Thanks."

68.     Denkewalter replied (in Exh. 13, near the bottom of page 1) by sending a copy of the Promissory Note (Exh. 1), but reiterating, "You should have had a copy plus I gave one to Bobbie [FDG's bookkeeper] for doing taxes." [2]

69.     While Denkewalter focused most of his inquiries on the disposition of Ziegler's funds and demanding that Ziegler be paid as promised, Denkewalter also made repeated demands on Thomas, Olswang and FDG on his own behalf that he be made whole on the charges improperly made under his credit cards, and that the sums due him under his exit agreement (Exh. 3) be paid.

---

[2]  Exhs. 7, 9, 10, 12 and 13 also show Denkewalter repeatedly seeking information about the company's tax calculations for 2018 so that he could complete his personal tax returns for that year. Thomas, Olswang, and FDG have, in fact, withheld all such information from Denkewalter for both 2018 and 2019, in an apparent further effort to conceal their activities from Denkewalter in his roles as both a creditor himself and a representative of Ziegler as creditor.

70.     Thus, the email of Exh. 5 (from February 22, 2019) reveals that Denkewalter was demanding relief on the illicit credit card charges and the attorneys' fees FDG and Thomas owed Denkewalter's law firm, to which Thomas responded, "We will be working out a deal with Amex, you and your investor," and "We will address the fee that is out there and a final settlement."

71.     Exh. 6 (from July 19, 2019) shows Denkewalter also demanded from Thomas and Olswang payment of the credit card bills at that time, while Exh. 7 (from August 1, 2019) includes a request to Thomas and Olswang for payment of past due sums as well as satisfaction of the American Express credit card debt.

72.     In Exh. 8, Denkewalter wrote to Olswang, "Can you please address the other items?  John's Discover Card charges?  AMEX?  Starting payments to me?" Exh. 9 to Olswang and Thomas asked, on September 12, 2019, "Have you finished both tax returns?  Any word on St. Paul?  Have you contact [sic] AMEX regarding your bill?  Are you going to start paying me soon?"  These pleas were reiterated a week later in Exh. 9, to no avail.

**Sums Owed to Ziegler and Denkewalter by January 2020**

73.     By the end of January 2020, FDG and JET Park owed Ziegler at least the return of his earmarked loan for the aborted St. Paul Parking Ramp purchase, in the sum of $250,000.00, plus $12,000.00 in delinquent interest payments, a total of at least $262,000.00, pursuant to Exh. 1.

74.     Meanwhile, Denkewalter's exit agreement with FDG required it to pay Denkewalter $250,000.00 under its internal Exh. A, ¶ 3, as discussed above.

75.     However, that agreement also required FDG to amend the Operating Agreement for its Star Realty affiliate so as to give Denkewalter a 30% membership interest (Exh. 3, at internal Exh. A, ¶ 5), which implied an agreement by FDG to ensure that Denkewalter would be

paid his share of distributions resulting from the subsequent sale of property on Superior Avenue in Chicago. That share of distributions came to approximately $30,000.00, but it was never paid to Denkewalter, though on information and belief the other members' distributions were paid. Star Realty was subsequently "terminated," according to the Illinois Secretary of State, so the funds belonging to Denkewalter were presumably misappropriated to the company's other members, Cast Iron Trust (of which Thomas, on information and belief, is the primary beneficiary) and Olswang.

76. Exh. 3 also required FDG to wire to Denkewalter's IOLTA account, for Ziegler's benefit, the minimum sums anticipated upon sale of the Parking Ramp (Exh. 3, at internal Exh. A, ¶ 4), which implied an obligation to Denkewalter under his exit agreement – and not just to Ziegler under his Promissory Note – to return the earnest money loan amount when the purchase of the Parking Ramp was aborted and the earnest money was refunded from the Old Republic title insurance company escrow.

77. Exh. 3 also obligated FDG to Denkewalter, in handwritten terms preceded by an asterisk on its signature page, for attorneys' fees invoiced by Denkewalter's firm, Denkewalter & Angelo, but provided that Denkewalter would pay them from the other sums owed to Denkewalter personally.

78. Thus, by the end of January 2020, FDG owed Denkewalter at least the following: (i) $250,000.00 as his buyout payment under Exh. 3, at its Exh. A, ¶ 3; (ii) $84,594.22 for charges to Denkewalter's American Express credit card, plus $4,086.15 for charges to his Discover credit card, including interest and late fees demanded by the credit card companies; (iii) $30,000.00 for Denkewalter's unpaid share of distributions by Star Realty; and (iv) satisfaction of the $262,000.00 debt to Ziegler (including interest per the Promissory Note).

79.     In addition, depending on how Exh. 3's internal Exh. A, ¶ 2 is interpreted, another $250,000.00 either is owed to Denkewalter presently, due to the "sale" of Ecolab *to* FDG or one of its affiliates, or will be due him upon the sale of that property *by* FDG sometime in the future.

### Ziegler's and Denkewalter's Further Demands for Payment

80.     In response to Olswang's proposal to meet in Exh. 13, Denkewalter hired attorneys Gregg Minkow and Jeff Steinback to communicate Denkewalter's position as both a creditor himself, and as an attorney seeking to enforce Ziegler's rights under Exh. 1.

81.     At Denkewalter's direction, Minkow wrote to Olswang on January 22, 2020 (in **Exh. 14**), prioritizing Ziegler's claims and offering to discuss Denkewalter's after first making sure Ziegler was repaid, but asserting nonetheless both Ziegler's and Denkewalter's rights to payment of the sums Thomas, Olswang, FDG, and JET Park had deprived them of, respectively.

82.     Olswang responded to Minkow on January 23, 2020 (in **Exh. 15**), stating in part:

> "Mr. Thomas did not approve execution of the note nor the terms contained therein. Mr. Denkewalter and Mr. Ziegler did this transaction amongst themselves completely without Mr. Thomas' input or approval. To suggest anything to the contrary is wholly inaccurate."

83.     As shown above and in the exhibits hereto, it is Olswang's letter which is inaccurate and plainly false. Thomas negotiated the terms of the Promissory Note at the Hackney's restaurant meeting; Thomas clearly knew that the earnest money for his companies' planned purchase of the Parking Ramp did not materialize out of thin air; Thomas' deal points with Denkewalter in September 2018 clearly showed his understanding that any refund by Old Republic of the earnest money would have to go back to Denkewalter's IOLTA account; and after Denkewalter's departure as an active party from FDG and JET Park, Olswang and Thomas were repeatedly reminded in writing of their obligations to Ziegler, and acknowledged them in

writing as well.

84.     Following the initial exchange of letters, Olswang proposed a plan to repay Ziegler with principal and interest over a six-month period, as set forth in the exchange of emails attached as **Exh. 16**, but failed to make even the first payment (*see* **Exh. 17**).

85.     Olswang attempted to obtain a release of claims in exchange for the proposed piecemeal payments to Ziegler.  Ziegler, communicating through Minkow, refused to provide such a release, as reflected in the email exchange attached as **Exh. 18**.

### Clues to the Disposition of the Funds Due Ziegler and Denkewalter

86.     Thomas and Olswang have never disclosed to the Plaintiffs how the moneys owed to Ziegler and Denkewalter were used.  However, there are indications the moneys were used to finance the acquisition or improvement of valuable income-earning property by the Defendants, or to pay their expenses so as to free up other monies for the acquisition, improvement, and monetization of those properties:

a.     On September 11, 2019, the *Daily Herald*, a suburban Chicago-area newspaper, reported that in July of that year – while FDG was still withholding the interest payment Denkewalter demanded for Ziegler, and the information Denkewalter sought on Ecolab – 901 Center bought the former Sherman Hospital site in Elgin, Illinois.  The site was designated for redevelopment into a COVID-19 treatment center by the State of Illinois, and various government agencies invested heavily – $18 million, according to news reports – in improving and outfitting the site for that purpose.

b.     According to the *Daily Herald* article, the property was purchased by 901 Center, but the article stated that the real owner is FDG, with Thomas (whom the paper interviewed) as "CEO and managing principal," and Olswang as "president and principal of the

company."

c.      According to the Illinois Secretary of State, one of 901 Center Street Holdings LLC's two Managers is Olswang, and the company has the same principal office address as FDG and JET Park.  Meanwhile, Thomas signed a document entitled "Exercise of Gubernatorial Emergency Taking Power" as "Property Owner or Agent of Owner."

d.      901 Center is presently seeking compensation from the State for use of the Sherman Hospital site, in Case No. 2020 ED 000005 in the Circuit Court of the 16th Judicial Circuit, Kane County, Illinois, with a hearing on its claim scheduled for August 25, 2020.  901 Center and/or FDG have hired attorneys to represent 901 Center in that proceeding.

e.      Subsequently, on April 28, 2020, JET Hospitals entered into a contract to purchase the Westlake Hospital site from the Bankruptcy Trustee in Case No. 19 B 22878 in the United States Bankruptcy Court for the Northern District of Illinois, for the sum of $12 million, and thereafter, on information and belief, made an earnest money deposit of $1.2 million toward the purchase.

f.      The consummation of the sale is subject to the results of an auction planned by the Bankruptcy Court to see if a better or higher bid can be obtained, and confirmation by Order of that Court in the absence of a superior bid; the auction has been rescheduled numerous times but is presently scheduled for August 20, 2020.  Compensation for the State's planned use of the property is the subject of proceedings in Case No. 2020 L 050213 in the Circuit Court of Cook County, Illinois.  JET Hospitals and/or FDG have hired attorneys to represent JET Hospitals in the Bankruptcy case.

g.      Thomas was convicted of a crime in relation to the Village of Riverdale, Illinois, and part of his sentence required him to pay restitution to that municipality.  According to the

Village's records, obtained by Plaintiffs' counsel under the Illinois Freedom of Information Act (*see* **Exh. 19**, attached), Thomas paid $75,000.00 on February 25, 2016, and only $47,125.00 between that date and October 4, 2019, a period of more than 3 years. However, Riverdale received restitution on Thomas' account in the amounts of $45,000.00 on December 3, 2019, $75,000.00 on January 6, 2020, and $25,000.00 on February 10, 2020 – a total of $145,000.00 in the roughly 3-month period immediately following the November 2019 refund of Ziegler's earmarked earnest money loan by Old Republic Title Insurance Company to the companies Thomas controlled.

h. The payment of restitution to Riverdale is at least as much to enhance the prospects for Thomas' businesses as for his personal benefit; a *Chicago Sun Times* article wrote on May 18, 2020:

> "This gets into what Thomas wants to convey about himself, to the public or anyone liable to do business with him. Thomas said last week he's almost done making restitution to Riverdale. 'I've paid over $300,000. My final payment of $90,000 will be made in the next two weeks. Not many guys make their restitution,' he said."

87. The FDG website (*see* web page attached as **Exh. 20**) shows both the Parking Ramp and the former Sherman Hospital site as part of FDG's "Portfolio," and lists Star Realty (in the attached **Exh. 21**) as one of FDG's "subsidiaries;" Thomas is shown on the website as "CEO – Managing Principal" and Olswang is shown as "President – Principal" (**Exh. 22**).

88. Consequently, on information and belief, the Ziegler earnest money funds (which should have been sent back to Denkewalter's IOLTA account when the Parking Ramp purchase contract terminated), and the funds owed to but withheld from Denkewalter individually and from his law firm, were instead diverted by Thomas and/or Olswang, and used to finance either the purchase of the former Sherman and Westlake Hospital properties, attorneys' fees for proceedings to monetize those properties, restitution to lift Thomas' standing in the business

18

community so that his businesses would not be shunned, or pay other expenses of the Thomas

and Olswang businesses (including *de facto* compensation to Thomas and/or Olswang) to free up

other funds for business purposes.

89.     Since the FDG website (Exhs. 20 and 21) indicates the company is engaged as the

umbrella organization for numerous businesses besides those named as defendants in this

lawsuit, and has numerous properties in its portfolio, the ways in which funds diverted from

Ziegler and Denkewalter were used to enhance FDG's and its affiliates' businesses and profits

cannot be fully known until lawsuit discovery is conducted.

## COUNT I - BREACH OF CONTRACT (CLAIM BY ZIEGLER)

90.     Ziegler incorporates herein by this reference paragraphs 1 through 89, above.

91.     Ziegler promised to loan $250,000.00 to FDG on the condition it would be used

solely as earnest money toward the purchase of the Parking Ramp.

92.     In consideration of the foregoing promise, FDG, through Thomas (in the above-

described meeting at Hackney's restaurant), agreed to repay the principal sum of the loan, plus

interest and other consideration as stated above.

93.     The terms of the loan agreement were memorialized in Exh. 1 hereto, which

Denkewalter signed as FDG's then-agent with the explicit approval of FDG's direct or indirect

majority owner, Thomas, and the terms of Exh. 1 are binding upon FDG.

94.     The only reasonable interpretation of Exh. 1 is that when the contract to purchase

the Parking Ramp terminated, and there was no possibility of FDG using the loaned moneys for

their singular, stated purpose, the money and accrued interest thereon would have to be returned

to Denkewalter's IOLTA account for repatriation to Ziegler.

95.     Indeed, in Exh. 4, Thomas, in his capacity as FDG's agent as well as on his own

behalf personally, admitted that this was the only appropriate disposition of Ziegler's loan principal in the event the purchase of the Parking Ramp was not consummated.

96.    FDG breached the loan agreement, first by failing to pay Ziegler interest when due in February 2019, and then by failing to repay the principal and accumulated interest to Ziegler by way of transfer to Denkewalter's IOLTA account after Old Republic Title Insurance Company transferred the earnest money for the terminated purchase contract to accounts controlled by FDG's agents.

97.    Alternatively, the delivery of the $250,000.00 earmarked for the Parking Ramp earnest money, its acceptance by FDG and JET Park, and its nonreturn comprised the creation of an express or implied bailment contract which FDG and JET Park breached by failing to return the funds to Ziegler after the Parking Ramp deal collapsed and Old Republic refunded the money.

98.    Ziegler has been damaged by the aforesaid breach in the sum of $250,000.00, plus accrued interest thereon at the rate of 2.4% from January 25, 2018 through the date in November 2019 it was refunded and transferred by Old Republic to the Defendants, and any lost earnings thereon that Ziegler could have obtained had the money been refunded to him as required.

99.    Exh. 1 also provides, and Ziegler is entitled to receive, an award of reasonable attorneys' fees and litigation costs incurred in bringing this enforcement action.

100.    Ziegler has performed all conditions on his part entitling him to payment of the loan principal, accrued interest, attorneys' fees from FDG, and any other performance under Exh. 1 or the bailment contract due from FDG.

WHEREFORE, Ziegler requests judgment against FDG in the sum of USD

$250,000.00, plus interest in the sum of at least $15,500.00 thru August 2020; imposition of a constructive trust, proportionate to the contribution made by the withholding of the sums owed to Ziegler, upon any interests in real property acquired by the Defendants as a result of the diversion of the Old Republic refund of earnest money, and any upon any income to the Defendants' businesses that resulted from the diversion of such money; reasonable attorneys' fees; costs of suit; and such other relief as is just.

### COUNT II - FRAUDULENT MISREPRESENTATION (CLAIM BY ZIEGLER)

101.    Ziegler incorporates herein by this reference paragraphs 1 through 89, above.

102.    At all relevant times, FDG, JET Park, Thomas and Olswang knew that the Parking Ramp earnest money was required to be immediately repatriated to Ziegler if the purchase of the Parking Ramp was not consummated; that Ziegler and Denkewalter, on his behalf, were intensely interested in the safekeeping and disposition of the loaned funds, Denkewalter having frequently inquired about them; and that Ziegler was relying upon the timely communication by FDG, JET Park, Thomas and Olswang, to Ziegler's representative, Denkewalter, as to any event which might entitle Ziegler to the return of his money, and any event that might jeopardize the secure return of the money to him.

103.    In addition, the turnover of the funds by Ziegler (via Denkewalter's IOLTA transfer), for the explicit and limited use thereof as earnest money for the Parking Ramp purchase, created a trust relationship under which (i) the loan principal formed the corpus of the trust, and (ii) FDG, and its Managers as of the time the money was refunded by Old Republic, were bailees trustees holding a fiduciary duty to ensure that upon such refund due to termination of the purchase contract, the money would in turn be promptly repatriated to Ziegler by way of transfer back to the Denkewalter IOLTA account from which it came.

104.    Further, as shown by (i) the surreptitious reliance on Denkewalter's credit cards by FDG, Thomas and/or Olswang, (ii) FDG's default on paying interest to Ziegler when due, (iii) its failure to pay Denkewalter the sums due him on March 31, 2019 under Exh. A of Exh. 3, (iv) the dissipation of Ziegler's funds as soon as they were refunded by Old Republic, and (v) FDG's apparent inability to make even the first installment payments promised by Olswang, FDG was insolvent throughout 2019, including at the time of the Old Republic refund of Ziegler's funds, in that FDG was unable to pay its just debts as they came due.

105.    With FDG thus having entered the zone of insolvency, the company and its Managers, Thomas and Olswang, owed a fiduciary duty to creditors like Ziegler and Denkewalter to protect what assets the company had, and deploy them toward satisfying those creditors' rights, rather than concealing or diverting the funds to other purposes.

106.    In addition, the fiduciary duties created by the trust relationship surrounding the Ziegler funds, and the Managers' duties to protect creditors of the company once it entered the zone of insolvency, included a duty of candor and honesty toward both Ziegler and Denkewalter, including the duty to promptly communicate, rather than conceal, information about the disposition of the monies owed to such creditors.

107.    Further still, as controlling Managers of FDG (in which Denkewalter was and is still a minority Member), Thomas and Olswang owed Denkewalter a fiduciary duty of good faith and fair dealing under the Illinois Limited Liability Company Act (at 805 ILCS 180/15-3(g)(2) and (d)), which included a duty to keep Denkewalter informed of significant company events he had asked about, especially insofar as they clearly and foreseeably would have an adverse impact on his relationship with the person Thomas called "your investor," or involved running up debt on credit cards (originally procured by Denkewalter to facilitate the conduct of limited but

legitimate company business) for which they knew Denkewalter would incur claims from card issuers if not actual liability to them.

108.    In derogation of the aforesaid duties to speak, Thomas and Olswang, on their own behalves individually and also on behalf of FDG and JET Park as those companies' agents, intentionally withheld from Denkewalter and Ziegler information about the termination of the Parking Ramp purchase contract, the anticipated receipt of the refunded Ziegler loan money from Old Republic, the actual receipt of that money, and the misuse of that money, with the intention that Denkewalter and Ziegler rely upon those omissions to refrain from taking preemptive legal action to recover the money directly from Old Republic or from FDG or its affiliates while the money was still in their possession or control.

109.    Also in derogation of the aforesaid duties to speak, Thomas and Olswang, on their own behalves individually and also on behalf of FDG and JET Park as those companies' agents, withheld from Denkewalter information on the extent to which FDG had, on information and belief, become insolvent, and the extent to which they were using Denkewalter's credit cards to fund operations and compensate one or both Managers with no intention or ability to pay the resulting debts.

110.    Further, Thomas' representation in the September 2018 negotiations with Denkewalter that any refund of earnest money by Old Republic would be immediately transferred to Denkewalter's IOLTA account for Ziegler's benefit created a duty on the part of Thomas and FDG to proactively inform Denkewalter and Ziegler as soon as those plans changed, rather than waiting until they were caught having already dissipated Ziegler's money, in effect rendering their silence an omission to reveal proactively the material facts necessary to render their prior statements not inaccurate.

23

111. Indeed, Thomas, Olswang, FDG, and JET Park may never have intended to return Ziegler's money upon refunding by Old Republic. Rather, the aforesaid affirmative representations were more likely part of a fraudulent scheme by Thomas (and, possibly, Olswang as his co-conspirator), formulated in August 2018 if not earlier, to retain the earnest money or any refund thereof to benefit Thomas, Olswang, and FDG to Ziegler's disadvantage.

112. Thomas, Olswang, and FDG intended by their misrepresentations, whether proactive or by omission when they had a duty to speak, to deter Ziegler, directly and through his representative, Denkewalter, from taking decisive action to secure control over the earnest money whenever a refund might be forthcoming, and thereby thwart the repatriation of any such refund to Ziegler as explicitly promised by Thomas.

113. On information and belief, Thomas, Olswang, FDG, and JET Park did, in fact, divert the Ziegler earnest money funds, and no longer have the funds in their possession, having accomplished the objective of their fraudulent statements and omissions.

114. Thomas, Olswang, FDG, and JET Park knew when they variously made their statements and omissions as described above that those statements and omissions would convey a false impression that Ziegler's money would be protected and refunded in the event it was no longer being used as earnest money for the purchase of the Parking Ramp.

115. Ziegler reasonably relied upon the aforesaid proactive misrepresentations and omissions by failing to take action to secure the earnest money while still in the possession of Old Republic, and thereby prevent the fraudulent diversion thereof by Thomas, Olswang, FDG, and/or JET Park.

116. Ziegler has suffered damages as a proximate result of the aforesaid misrepresentations in the sum of the $250,000.00 earnest money refund diverted, plus any

interest paid thereon while in the possession of Old Republic, and any lost earnings thereon that Ziegler could have obtained had the money been refunded to him as required.

117.     The actions of Thomas, Olswang, FDG, and/or JET Park were undertaken with malice and a reckless disregard for Ziegler's rights.

WHEREFORE, Ziegler requests judgment against Thomas, Olswang, FDG, and JET Park, jointly and severally, for a sum in excess of USD $250,000.00; imposition of a constructive trust, proportionate to the contribution made by the withholding of the sums owed to Ziegler, upon any interests in real property acquired by the Defendants as a result of the diversion of the Old Republic refund of earnest money, and any upon any income to the Defendants' businesses that resulted from the diversion of such money; punitive damages in an amount to be determined at trial; costs of suit; and such other relief as is just.

## COUNT III – BREACH OF FIDUCIARY DUTY AND CONSTRUCTIVE FRAUD (CLAIM BY ZIEGLER)

118.     Ziegler incorporates herein by this reference paragraphs 1 through 89 and 102 through 117, above.

119.     By reason of their proactive misrepresentations and omissions when they had a duty to speak, as well as by their actual diversion of the earnest money refund rather than repatriating it to Ziegler, Defendants Thomas, Olswang, FDG, and JET Park breached their fiduciary duties to Ziegler – arising from both the trust relationship described above and from Thomas' and Olswang's duties as Managers once FDG entered the zone of insolvency, also as described above – and committed a constructive fraud against him by breaching those fiduciary duties.

120.     Ziegler has suffered damages in a sum in excess of $250,000.00, plus the interest accumulated thereon while in the possession of Old Republic, and lost earnings thereafter, as a

proximate result of the aforesaid breaches of duties by Thomas, Olswang, FDG and JET Park.

WHEREFORE, Ziegler requests judgment against Thomas, Olswang, FDG, and JET Park, jointly and severally, for damages in a sum in excess of USD $250,000.00; imposition of a constructive trust, proportionate to the contribution made by the withholding of the sums owed to Ziegler, upon any interests in real property acquired by the Defendants as a result of the diversion of the Old Republic refund of earnest money, and any upon any income to the Defendants' businesses that resulted from the diversion of such money; punitive damages in a sum to be determined at trial; costs of suit; and such other relief as is just.

## COUNT IV – CONVERSION (CLAIM BY ZIEGLER)

121.     Ziegler incorporates herein by this reference paragraphs 1 through 89, above.

122.     Ziegler at all times had an absolute and unconditional right to possession of the earnest money refunded by Old Republic.

123.     Ziegler demanded that Thomas, Olswang, FDG, and JET Park return the earnest money by way of the correspondence from Denkewalter and Minkow.

124.     Thomas, Olswang, FDG, and/or JET Park directly or indirectly asserted dominion over and withheld from Ziegler the earnest money refund to which he had a superior right of possession.

125.     The actions of Thomas, Olswang, FDG, and/or JET Park were undertaken with malice and a reckless disregard for Ziegler's rights.

WHEREFORE, Ziegler requests judgment against Thomas, Olswang, FDG, and JET Park, jointly and severally, for a sum in excess of USD $250,000.00; imposition of a constructive trust, proportionate to the contribution made by the withholding of the sums owed to Ziegler, upon any interests in real property acquired by the Defendants as a result of the

diversion of the Old Republic refund of earnest money, and any upon any income to the Defendants' businesses that resulted from the diversion of such money; punitive damages in an amount to be determined at trial; costs of suit; and such other relief as is just.

### COUNT V – BREACH OF CONTRACT (CLAIM BY DENKEWALTER)

126.    Denkewalter incorporates herein by this reference paragraphs 1 through 89, above.

127.    Denkewalter agreed to relinquish all but 2% of his Membership Interest in FDG on or before September 13, 2018.

128.    In consideration thereof, FDG promised to pay Denkewalter certain the sums at stated times; to wire funds relating to the Parking Ramp to Denkewalter for Ziegler's benefit; and to provide Denkewalter with minority interests in certain entities under common control with FDG.

129.    The terms of the aforesaid exchange of promises were accurately memorialized in Exh. 3, signed by Denkewalter, and by Thomas as Manager on behalf of FDG, on information and belief in consultation with Olswang.

130.    FDG breached Exh. 3 by failing to pay the sum of $250,000.00 by March 31, 2019 as required under Exh. 3, at internal Exh. A, ¶ 3; by failing to return Ziegler's $250,000.00 earnest money loan for the Parking Ramp as impliedly required by Exh. 3, at internal Exh. A, ¶ 4; and by failing to ensure that Star Realty paid Denkewalter his share of distributions, at $30,000.00 for his 30% share, as impliedly required by Exh. 3, at internal Exh. A, ¶ 5.

131.    Denkewalter has been damaged in the sum of at least $280,000.00 as a result of the aforesaid breach of Exh. 3; by lost earnings on the funds that have been denied him; and by the damage that has occurred to his 30-year relationship with Ziegler.

132.    Denkewalter has performed all conditions on his part entitling him to payment of

the sum referenced above, and any other performance under Exh. 3 due from FDG.

WHEREFORE, Denkewalter requests judgment against FDG in the sum of USD $280,000.00, plus the sum of $262,000.00 payable to the Denkewalter & Angelo IOLTA account for the benefit of Ziegler, plus interest as allowed by law; imposition of a constructive trust, proportionate to the contribution made by the withholding of the sums owed to Denkewalter or his firm's IOLTA account, upon any interests in real property acquired by the Defendants as a result of such withholding, and any upon any income to the Defendants' businesses that resulted from the diversion of such sums; costs of suit; and such other relief as is just.

## COUNT VI – BREACH OF FIDUCIARY DUTY AND FRAUD <br> (CLAIM BY DENKEWALTER)

133.    Denkewalter incorporates herein by this reference paragraphs 1 through 89, above.

134.    As noted above, Thomas and Olswang owed Denkewalter, a minority Member of FDG, a fiduciary duty of good faith and fair dealing under the Illinois Limited Liability Company Act (at 805 ILCS 180/15-3(g)(2) and (d)), which included a duty to keep Denkewalter informed of significant company events he had asked about, especially insofar as (i) they clearly and foreseeably would have an adverse impact on his relationship with the person Thomas called "your investor," or (ii) involved running up debt on credit cards (originally procured by Denkewalter to facilitate the conduct of limited but legitimate company business) for which they knew Denkewalter would incur claims from card issuers if not actual liability to them.

135.    In addition, under 805 ILCS 180/15-3(g)(2) and (b)(1), Thomas and Olswang owed Denkewalter a duty to account to FDG (of which Denkewalter remains a minority Member), and to hold as trustee for it, any property, profit, or benefit derived by them in the

conduct of the company's business or derived from a use of the company's property.

136.    Thomas and FDG never intended when Thomas signed Exh. 3 to comply with the bulk of its terms.

137.    Rather, Exh. 3 was used by Thomas and FDG as part of a fraudulent scheme to exclude Denkewalter from participation in and knowledge of the activities of Thomas and FDG so that they could surreptitiously divert the Ziegler earnest money refund; surreptitiously buy and "flip" Ecolab and other properties without Denkewalter receiving his share of the benefits under the 27% Membership Interest he held in FDG prior to the execution of Exh. 3; and surreptitiously obtain the benefit of Denkewalter's credit cards for their benefit at his expense.

138.    In addition, on information and belief, Thomas, FDG and (also on information and belief) Olswang, surreptitiously diverted the sums due Denkewalter but unpaid under Exh. 3 to make further investments, directly or indirectly, in property owned by FDG, Thomas and/or Olswang, or to directly or indirectly pay the expenses of monetizing those properties, by which they are unjustly enriched at Denkewalter's expense.

139.    In addition, Thomas and Olswang, as the persons in control of Star Realty, had responsibility for ensuring that distributions of profits were made in proportion to ownership interests, but they instead withheld from Denkewalter at least the $30,000.00 owed to him from the Superior Avenue sale by reason of his 30% Membership Interest.

140.    All the foregoing acts comprised oppression of Denkewalter as a non-managing Member of FDG, as well as bad faith and unfair dealing toward Denkewalter, misuse of Denkewalter's property interests in his buyout consideration and credit cards, for the selfish aggrandizement of Thomas and Olswang personally, all in violation of 805 ILCS 180/15-3(g)(2), (d), and (b)(1).

141.     Further, as also noted above, Thomas, Olswang and FDG owed Denkewalter a fiduciary duty to protect his interests as a creditor once FDG entered the zone of insolvency, where it appears to have found itself throughout 2019 (and presently) as shown by (i) the surreptitious reliance on Denkewalter's credit cards by FDG, Thomas and/or Olswang, (ii) FDG's default on paying interest to Ziegler when due, (iii) its failure to pay Denkewalter the sums when due him on March 31, 2019 under Exh. A of Exh. 3, (iv) the dissipation of Ziegler's funds as soon as they were refunded by Old Republic, and (v) FDG's failure and apparent inability to make even the first installment payment promised by Olswang.

142.     Thomas' and Olswang's duties as Managers of an insolvent company at least included the duty to use such assets as were available to ensure as well as possible that creditors like Denkewalter and Ziegler were paid what they were owed, instead of using the funds for personal expenses or to buy more properties in which they profited at their creditors' expense.

143.     Thomas and Olswang breached their duties to Denkewalter, as Managers of an insolvent company, by diverting funds available to pay Ziegler and Denkewalter to the personal enrichment of Thomas and Olswang.

144.     In addition to comprising a breach of their fiduciary duties, the aforesaid conduct comprised a fraud upon Denkewalter insofar as it used intentional misstatements of intent to pay him, and concealment of asset diversion and credit card debt accumulation, to deprive him of (i) property he otherwise could have taken action to protect in a timely fashion, (ii) the chance to better protect his business associate, Ziegler, and (iii) the chance to avoid significant debt claims against Denkewalter by credit card issuers.

145.     Denkewalter has suffered damages as a proximate result of the abovementioned acts and omissions, including loss of the value of his Membership Interest in FDG that existed

prior to September 13, 2018 (having a value in excess of $280,000.00), injury to his professional relationship with Ziegler (financial impact to be determined), the unpaid sum of the charges by Thomas, FDG, and/or Olswang on Denkewalter's credit cards (in excess of $88,000.00) if he is compelled to pay them, damage to his creditworthiness as evaluated by potential lenders, and otherwise.

146.    The actions of Thomas, FDG, and Olswang were undertaken with malice and a reckless disregard for Denkewalter's rights.

WHEREFORE, Denkewalter requests judgment against Thomas, FDG, and Olswang, jointly and severally, for damages in excess of USD $280,000.00; imposition of a constructive trust, proportionate to the contribution made by the withholding of the sums owed to Denkewalter, upon any interests in real property acquired by the Defendants as a result of such withholding, and any upon any income to the Defendants' businesses that resulted from the diversion of such sums; punitive damages in an amount to be determined at trial; costs of suit; and such other relief as is just.

In the alternative, Denkewalter requests a judgment rescinding Exh. 3 insofar as it resulted in the transfer of Denkewalter's pre-agreement Membership Interest in FDG and any affiliated businesses.

In addition, Denkewalter requests entry of an order dissolving FDG under 805 ILCS 180/35-1(a)(5)(A) and (B), as Thomas and Olswang have acted, are acting, or will act in a manner that is illegal or fraudulent; and have acted or are acting in a manner that is oppressive and was, is, or will be directly harmful to Denkewalter.

**COUNT VII – VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (CLAIM BY ZIEGLER AND DENKEWALTER)**

147.    Ziegler and Denkewalter incorporate herein by this reference paragraphs 1 through

146, above.

148.     Thomas', Olswang's and FDG's various above-described affirmative misrepresentations that Ziegler's money would be repatriated when the Parking Ramp purchase contract terminated, surreptitious diversion of the monies when refunded by Old Republic, withholding of information from Denkewalter in order to hide the contract termination and refund until their diversion of the Ziegler money was complete, and surreptitious funding of their businesses and lifestyles by charging Denkewalter's credit cards and withholding sums owed to him after essentially forcing him out of the company, all required and undertook the use of wires across state lines – to acquire and divert refunds and sale proceeds from Minnesota, initiated from offices in Illinois, and to procure payment by remotely located credit card issuers and processors for improper credit card charges – all with the intent and effect of defrauding Ziegler and Denkewalter, respectively, and thereby producing the losses described above.

149.     As such, each of the aforementioned acts comprised wire fraud in violation of 18 U.S.C. § 1343, and together they comprise a pattern of racketeering activity (including two or more wire fraud violations within a 10-year period), with the consistent purpose and effect of financing and growing FDG's empire with the funds fraudulently misappropriated from Ziegler and Denkewalter, resulting in losses of at least $250,000.00 to Ziegler and potentially $368,680.37 or more to Denkewalter.

150.     As a consequence, the conduct of Thomas, Olswang and FDG described above also comprised a violation of the Racketeer Influenced and Corrupt Organizations Act, at 18 U.S.C. § 1962, entitling Ziegler and Denkewalter to a trebling of their damages under Counts II, III, and VI hereof, and an award of attorneys' fees, all under 18 U.S.C. § 1964(c).

WHEREFORE:

A. Ziegler requests judgment jointly and severally against Thomas, Olswang, FDG, JET Park, and their affiliates receiving any of the funds diverted by any of the named Defendants, in the sum of at least USD $750,000.00, plus attorneys' fees and costs of suit; imposition of a constructive trust, proportionate to the contribution made by the withholding of the sums owed to Ziegler, upon any interests in real property acquired by the Defendants as a result of the diversion of the Old Republic refund of earnest money, and any upon any income to the Defendants' businesses that resulted from the diversion of such money; and such other relief as is just; and

B. Denkewalter requests judgment jointly and severally against Thomas, Olswang, FDG, JET Park, and their affiliates receiving any of the funds diverted by any of the named defendants, in the sum of at least USD $1,106,041.11 (minus $253,782.66 if Denkewalter is not compelled to pay any of the American Express and Discover charges run up by Thomas, FDG, and/or Olswang), plus attorneys' fees and costs of suit; imposition of a constructive trust, proportionate to the contribution made by the withholding of the sums owed to Denkewalter, upon any interests in real property acquired by the Defendants as a result of such withholding, and any upon any income to the Defendants' businesses that resulted from the diversion of such sums; and such other relief as is just.

PLAINTIFF DEMANDS TRIAL BY 12-PERSON JURY ON ALL MATTERS HEREIN.

Dated: August 25, 2020

MICHAEL ZIEGLER and KIM DENKEWALTER, Plaintiffs

By: _____/s/Gregg I. Minkow_____
                One of Their Attorneys

Gregg I. Minkow
Minkow & Bergman, LLC
123 N. Wacker Drive, Suite 250
Chicago, Illinois 60606
Phone: (847) 489-6999
Email: gminkow@minkowbergman.com
Attorney No. 6181058

Jeffrey B. Steinback
Attorney at Law
8351 Snaresbrook Road
Roscoe, Illinois 60173
Phone: (847) 624-9600
Email: jbsteinbacklaw@aol.com
Attorney No. 2718189