**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KIM DENKEWALTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 20 C 5013 |
| | ) | |
| JOHN THOMAS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION</u>**

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendants JET Park, LLC ("JET Park"), Freedom Development Group, LLC – 87th Street, Freedom Development Group LLC – Aurora, Freedom Development Group, LLC – North Avenue, Freedom Development Group, LLC – Waukegan, 901 Center Street Holdings, LLC ("901 Center"), JET Hospitals, LLC ("JET Hospitals"), TOT Holdings II, LLC, Star Real Estate, LLC ("Star Real Estate"), Jet Foods, LLC ("JET Foods"), Jet Foods Bishop, LLC, Jet Foods Carol Stream, LLC, Jet Foods Harvey, LLC, Jet Foods Naperville, LLC, Jet Foods Park Forest, LLC ("JET Foods Park Forest"), Jet Foods Rockford, LLC, and Jet Structures, LLC ("JET Structures") (together, "Entity Defendants"), Freedom Development Group, LLC ("FDG"), John Thomas, and Daniel Olswang's Motions to Strike and Dismiss the Plaintiff Kim Denkewalter's Second Amended Complaint ("SAC").

Dkt. # 47.  For the following reasons, Defendants' Motion to Strike is denied and their Motion to Dismiss is granted-in-part and denied-in-part.

## BACKGROUND

On February 3, 2021, Denkewalter filed his three-count SAC alleging breach of contract (Count I), breach of fiduciary duty and fraud (Count II), and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (Count III).  Defendants move to strike portions of the SAC, to dismiss the RICO claim and the fraud claim, and to dismiss the remainder of the action (upon dismissal of the RICO claim) for lack of jurisdiction.  Defendants also move to dismiss the Entity Defendants from the entire action, arguing that Denkewalter has not sufficiently pleaded that they are "alter egos" of Thomas, Olswang, and FDG.

For the purposes of these motion, the Court accepts as true the following facts from the SAC.  *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013).  All reasonable inferences are drawn in Denkewalter's favor.  *League of Women Voters of Chi. v. City of Chi.*, 757 F.3d 722, 724 (7th Cir. 2014).

Defendants Thomas and Olswang have been the sole managers of FDG since March 29, 2019.  Since its inception, FDG has been the flagship through which Thomas and Olswang operated and promoted their businesses in real estate acquisition and development, real estate brokerage, grocery stores, and construction.

JET Park was formed by FDG's owners as FDG's designated vehicle for the purchase and resale of real estate formerly used as a commercial parking structure in

2

St. Paul, Minnesota. FDG's website shows the parking structure, known as the RiverCentre Parking Ramp ("Parking Ramp"), as part of FDG's portfolio. The $250,000 down payment/earnest money for JET Park's intended purchase of the Parking Ramp came from funds loaned to FDG.

901 Center was formed by FDG's owners as FDG's designated vehicle for the purchase and operation of Illinois real estate which was previously the site of Sherman Hospital in Elgin, Illinois, which FDG's website shows as part of FDG's portfolio. The State of Illinois designated the site for use as a COVID-19 treatment center, but the State dropped that intention after investing significant sums on property improvements. Eminent domain litigation to obtain compensation owed to 901 Center for the State's temporary "taking" of the property resulted in a payout order, which directed over $1 million to TOT Holdings I, another Entity Defendant, which was not a party to the eminent domain case.

JET Hospitals was formed by FDG's owners as FDG's designated vehicle for the purchase and operation of Illinois real estate which had previously been the site of Westlake Hospital in Melrose Park, Illinois. The site was designated for use as a COVID-19 treatment center by the State of Illinois. On April 28, 2020, JET Hospitals contracted to purchase the site and lease it to the State, by way of a Court-ordered sale in the Northern District of Illinois Bankruptcy Court, for the sum of $12 million. Thomas signed the contract as managing member of JET Hospitals, and directed notices to be sent to Thomas "c/o [FDG]".

3

Star Real Estate was formed by FDG's owners for the purpose of brokering commercial real estate sales. The FDG website listed Star Real Estate, along with JET Structures (a construction company) and JET Foods (a grocery chain), as FDG's "subsidiaries". FDG's website listed virtually every property for which a separate Entity Defendant company is named as part of the "[FDG] Portfolio", and listed Thomas as "CEO – Managing Principal" and Olswang as "President – Principal" for the entire, overarching FDG operation.

Thomas was the founder and majority owner of all the Defendant companies. With the exception of JET Foods Park Forest, at all relevant times, all the Defendant companies have had the same principal office, and all have had Olswang as their registered agent.

From the formation of FDG on May 22, 2017, until about August 2, 2018 (and formalized in writing on or about September 13, 2018), Denkewalter was a manager and minority-owning member of FDG. On or about September 13, 2018, pursuant to a written agreement with FDG, Denkewalter formally resigned as manager of FDG and relinquished all but a 2% membership interest in FDG, a 30% membership interest in Star Real Estate, and 2.5% of FDG's interest in Questar, Inc. The written agreement was signed by Thomas on FDG's behalf.

In January of 2018, Denkewalter and his business associate, Michael Ziegler, met with Thomas and a sometimes fundraiser for Thomas and his projects, Rick DiMaria, at Hackney's restaurant in Glenview, Illinois. They met to discuss the

4

possibility of Ziegler loaning FDG $250,000 to be used as the earnest money for FDG's planned purchase, directly or through JET Park, of the Parking Ramp. At the meeting, Thomas described his past development experience and his plan for the purchase of the Parking Ramp, and told Ziegler that Thomas already had buyers lined up to purchase the Parking Ramp from FDG on a resale or "flip" after FDG procured the property. Ziegler and Thomas agreed that Ziegler would loan FDG the $250,000, to be used solely for earnest money on FDG's procurement of the Parking Ramp, in exchange for repayment when the "flip" was completed, along with interest at the rate of 2.4% per year (payable every February), a preferred right to receive the first $250,000 as an additional return on his loan, and 10% of any profit received by FDG in excess of $4 million through the purchase and resale or flip of the Parking Ramp.

On January 25, 2018, the terms of the loan were memorialized in a document entitled "Unsecured Promissory Note", which Denkewalter signed on FDG's behalf, pursuant to Thomas's direction as majority owner. The same day, Ziegler transferred the $250,000 to Denkewalter's attorney trust account ("IOLTA Account"), and Denkewalter promptly thereafter transferred the funds to an account held by Old Republic National Title Insurance Company ("Old Republic") as the escrow agent for FDG's purchase of the Parking Ramp from its owner, the Port Authority of the City of St. Paul ("Port Authority").

The Parking Ramp purchase was aborted after the Minnesota Court of Appeals held, on October 28, 2019, that another party had a right of first refusal to buy the

Parking Ramp in place of FDG or its proxy, JET Park. As a result, the contract between Port Authority and JET Park was terminated, and at some point in November 2019, Old Republic returned the earnest money to either FDG, JET Park, or persons then in control of those entities. However, instead of returning the earnest money to Ziegler, and despite repeated requests by Denkewalter for the Promissory Note to be honored and for information on the money's whereabouts, Thomas and Olswang diverted Ziegler's $250,000 to other purposes and hid from Denkewalter and Ziegler the uses to which the money was put after Old Republic returned it to FDG from the escrow.

Thomas explicitly told Denkewalter that in the event the purchase of the Parking Ramp was not consummated, Ziegler's loan principal would be promptly returned to Denkewalter's IOLTA Account. He confirmed this in writing by way of his notes in an outline of terms for Denkewalter's departure from his active role in FDG, and in the signed final departure agreement with Denkewalter, both sent to Denkewalter via email "using the interstate wire system." Dkt. # 33, ¶ 42. But when Denkewalter thereafter repeatedly asked Thomas and Olswang about the status of the earnest money that rightfully belonged to Ziegler, they repeatedly rebuffed him by way of emails telling him to "[s]top sending emails and calling which is just disrupting everyone" (February 22, 2019) and "[c]onstantly calling our office and harassing the staff is not appreciated" (July 18, 2019). *Id*. Olswang did, however, promise to let Ziegler know if there was any change, stating in an email: "There is nothing to report on St. Paul. We CANNOT

6

close until Seller can deliver clean title which they still cannot do, Once things change I will let Mime [*sic*] know." *Id*.

On December 4, 2019, when Denkewalter still had not received information on the loan from Thomas and Olswang, he contacted Old Republic to find out the status of the attempted Parking Ramp purchase. An Old Republic representative informed Denkewalter that the purchase contract had been terminated, and the earnest money had been returned to unspecified persons—information which Thomas and Olswang never shared with Ziegler. That same day, Denkewalter wrote to Thomas and Olswang: "Please advise how I can get the Zeigler [*sic*] deposit this week. I understand that the contract was terminated last month. I would have thought you would contact me. Please don't tell me you have misappropriated the Zeigler [*sic*] funds." *Id*., ¶ 43.

Thomas and Olswang did dissipate the Ziegler funds immediately after they were refunded by Old Republic, and the funds were used directly or indirectly for one or more of the following purposes:

1. As part of the $1.2 million earnest money deposited for JET Hospitals' attempt to buy the former Westlake Hospital site.

2. Funding 901 Center's eminent domain litigation against the State which resulted in a $4 million recovery for 901 Center's designees.

3. Payment of Thomas's restitution to the Village of Riverdale, Illinois pursuant to a criminal conviction.[1]

The use of Ziegler's funds to pay Thomas's criminal restitution would have been an investment in FDG's and its affiliates' businesses. For example, a May 2020 *Chicago Sun Times* article about FDG's purchase of the Sherman Hospital property and Thomas's criminal past stated:

> This gets into what Thomas wants to convey about himself, to the public or anyone liable to do business with him. Thomas said last week he's almost done making restitution to Riverdale. "I've paid over $300,000. My final payment of $90,000 will be made in the next two weeks. Not many guys make their restitution," he said.

Dkt. # 33, ¶ 45. If Thomas and other Defendants misused Ziegler's $250,000 at least in part to pay Thomas's restitution, it was an advertising or public relations investment in the Defendant companies, to prop up Thomas's image and make it more palatable for both governments and private investors to do business with FDG and its affiliates.

After Denkewalter's departure as manager, Thomas and Olswang used American Express and Discover credit cards in Denkewalter's name to run up significant debts for FDG business expenses as well as meals, ridesharing, and other living expenses, including expenses of Thomas's then-girlfriend. This created $84,594.22 in charges to

---

[1] In 2015, Thomas was convicted of stealing $375,000 in Riverdale taxpayer money earmarked to develop a marina in the Village, and was ordered to pay restitution in addition to a jail sentence. Thomas paid $75,000 in restitution on February 25, 2016, and $47,125 over the next three years. But the Village received $145,000 in restitution on Thomas's account from December 2019 to February 2020, i.e., the roughly three-month period following Old Republic's November 2019 refund of Ziegler's $250,000 to the companies Thomas controlled.

Denkewalter's American Express credit card, the bills for which were sent to FDG and thus were unknown to Denkewalter until well after they were incurred, and $4,086.15 in charges to his Discover credit card, including interest and late fees, payment for which the credit card issuers have demanded from Denkewalter.

On July 19, 2019, Thomas sent an email to Denkewalter saying "I had worked out an agreement with AMEX which they supposedly sent to you. I have not seen a thing since I sent them the initial payment. As we agreed, we will pay the AMEX bill." Dkt. # 33-1, at 119. On February 22, 2019, Thomas sent an email to Denkewalter saying "[w]e will be working out a deal with Amex, you and your investor." *Id*., at 117. According to Denkewalter, those statements were "knowingly false and made solely with the intent and effect of inducing Denkewalter to delay pursuing his legal remedies while Thomas, Olswang[,] and their companies continued to apply scarce monies elsewhere." Dkt. # 33, ¶ 47.

Furthermore, Denkewalter's departure agreement with FDG required FDG to pay Denkewalter $250,000 by March 31, 2019, and amend the Operating Agreement for its Star Real Estate affiliate to give Denkewalter a 30% membership interest, which "implied an agreement by FDG to ensure that Denkewalter would be paid his share of distributions resulting mainly or wholly from the subsequent sale of property on Superior Avenue in Chicago, which came to $30,000." *Id*., ¶ 48. The $250,000 was never paid, and Star Real Estate was subsequently "terminated" so the funds belonging to Denkewalter were "presumably misappropriated to the company's other members,

Cast Iron Trust (of which Thomas, on information and belief, is the primary beneficiary), and Olswang." *Id*.

Additionally, another $250,000 is either presently owed to Denkewalter due to the sale of the "Ecolab" property to FDG or its affiliates, or will be due to Denkewalter upon the resale of that property by FDG in the future.

## **LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.,* 694 F.3d 873, 878 (7th Cir. 2012). The Court accepts as true well-pleaded facts in the complaint and draws all reasonable inferences in favor of the plaintiff. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). The allegations in the complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

A plaintiff need not provide detailed factual allegations, but it must provide enough factual support to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The claim must be described "in sufficient detail to give the defendant 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a Rule 12(b)(6) motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009). A claim is facially plausible if the complaint contains sufficient alleged facts that allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

When claiming fraud, a party "must state with particularity the circumstances constituting fraud []. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The requirement that fraud be pled with particularity "ensures that plaintiffs do their homework before filing suit and protects defendants from baseless suits that tarnish reputations." *Pirelli Armstrong Tire Corp. Retiree Med. Ben Trust v. Walgreen Co.*, 631 F.3d 436, 439 (7th Cir. 2011). This requirement is not rigid, and what must be alleged will vary depending on the facts of the case. *Id*. at 442. The heightened pleading standard applies to all allegations of fraud (such as misrepresentation), not merely claims labeled fraud. *Id*. at 447.

## DISCUSSION

The Court addresses Defendants' Motion to Strike and Motion to Dismiss in turn.

### I. Motion to Strike

Defendants first move to strike certain allegations from the SAC under Rule 12(f). Specifically, Defendants argue that any allegations regarding Defendants' alleged failure to repay $250,000 to Ziegler must be stricken because Ziegler "is not owed any money and therefore Plaintiff cannot rely on the Ziegler facts to establish [his] RICO claim." Dkt. # 47-2, at 2. They assert that because Defendants settled with Ziegler, a former plaintiff in this case, and paid him $275,000, "all reference[s] to the

11

Ziegler matter must be stricken" and Denkewalter cannot rely on the alleged failure to pay Ziegler for his RICO claim. Defendants attach a settlement agreement, effective January 6, 2021, as well as a wire receipt from FDG for $275,000, dated January 7, 2021. Dkt. # 47-2, Ex. C.

Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are generally disfavored and are "within the discretion of the court." *Tucker Firm, LLC v. Alise*, 2012 WL 252790, at *2 (N.D. Ill. 2012) (citing *Talbot v. Robert Matthews Distrib. Co*., 961 F.2d 654, 665 (7th Cir. 1992)).

The only argument Defendants make is that because Ziegler has now been paid, the allegations regarding that transaction are somehow off limits and Denkewalter cannot rely on them. But they cite no authority for that proposition and fail to explain why that would be the case, or why paying Ziegler in 2021, after Ziegler initiated legal action against them, shows that Defendants did not fraudulently misappropriate his money in 2018. Denkewalter is not seeking to "resurrect" Ziegler's claim as Defendants suggest in their reply brief (Dkt. # 71, at 3–4)—he does not seek payment of the $250,000 that was owed to Ziegler or liability on Ziegler's behalf. Rather, he includes the Ziegler allegations to demonstrate a "pattern of racketeering activity" for purposes of his RICO claim. Even viewing Defendants' argument as one of immateriality, it still fails. Denkewalter can rely on the Ziegler allegations to establish

a pattern, even if he was not personally harmed by the failure to pay Ziegler in 2018–2019.

In *RWB Services, LLC v. Hartford Computer Group, Inc.*, the Seventh Circuit concluded that a plaintiff need not be harmed by each predicate act that makes up a RICO "pattern of racketeering activity." 539 F. 3d 681, 686–88 (7th Cir. 2008). The Seventh Circuit explained:

> The question here is whether the plaintiff's injury would have occurred "but for" the "violation of section 1962." The typical question asked in determining cause-in-fact is counterfactual: would the claimed injury still have happened if the defendant had not engaged in the tortious conduct alleged? This inquiry is a straightforward one in the mine-run tort or negligence claim. . . . Under RICO, however, such a simple question is harder to ask. A defendant is liable for a "violation of section 1962," and such a "violation" consists of, among other things, a "pattern of racketeering activity," which in turn results from at least two predicate acts each with its own essential elements.

*Id*. at 686 (citations omitted). The court then reasoned that rather than a literal application of the "but for" causation test, which might ask whether the plaintiff's injury would have occurred "but for" the underlying predicate acts, the "relevant question is instead whether the plaintiff's alleged injury would have resulted but for the entire 'violation of section 1962.'" *Id.* at 687 (citations omitted). Although a plaintiff "must allege an injury resulting from one of the predicate acts, courts must examine these acts in the context of the entire 'violation' when assessing factual causation." *Id.* (citations omitted). The court found that "[i]f a predicate act was sufficient to cause the plaintiff's injury and that predicate act was part of the entire 'violation of section 1962,' the

plaintiff has pled causation." *Id.* (citations omitted). The Seventh Circuit disagreed with the lower court's ruling that because a third party would have been a "better" plaintiff, the plaintiff could not rely on predicate acts pertaining to that third party to establish a "pattern" for purposes of RICO. *Id.* at 688.

Although Defendants have not raised a causation argument, *RWB* demonstrates why the Ziegler allegations are indeed material to Denkewalter's RICO claim. Because they go to the alleged pattern of racketeering activity, the Ziegler allegations are relevant to the claims at issue. The Court therefore denies Defendants' Motion to Strike.

## II.    Motion to Dismiss

Defendants also move to dismiss certain aspects of the SAC. The Court addresses each in turn.

### a.  RICO

Defendants assert that Denkewalter has failed to sufficiently state a claim under RICO, specifically that the RICO claim does not satisfy the heightened pleading standard of Rule 9(b).

To state a claim under RICO, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Slaney v. The Int'l Amateur Athletic Fed.*, 244 F.3d 580, 597 (7th Cir. 2001). "A 'pattern' of racketeering activity consists of at least two predicate acts of racketeering (e.g., extortion, mail fraud) within ten years." *Nowicki v. Delao*, 506 F. App'x 514, 516 (7th Cir. 2013).

14

The heightened pleading standard of Rule 9(b) is "of course applicable to allegations of fraud in a civil RICO complaint." *Goren v. New Vision Int'l*, 156 F.3d 721, 726 (7th Cir. 1998). "Accordingly, a RICO plaintiff must, at a minimum, describe the predicate acts [of fraud] with some specificity and state the time, place, and content of the alleged communications perpetrating the fraud." *Id*. (cleaned up). A RICO claim requires "a fuller set of factual allegations" that show the claim is not "largely groundless." *Drobny v. JP Morgan Chase Bank*, 929 F. Supp. 2d 839, 844 (N.D. Ill. 2013) (quoting *Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 803 (7th Cir. 2008)).

Defendants argue that Denkewalter's RICO claim fails under Rule 9(b) in five ways, all of which the Court rejects. Defendants first assert that "[t]here is not a single date tied to a single communication" and that Denkewalter must "allege the exact date of each communication [Denkewalter] claim[s] constitutes a predicated [*sic*] act." Dkt. # 47-2, at 6. But Denkewalter attached the emails he relied on as exhibits to his SAC, which clearly state the date on which each email was sent. Defendants next argue that Denkewalter "fails to identify where any alleged act took place other than to state 'in interstate commerce'" and that "[o]nce the Ziegler facts are deleted, there are no facts creating any transfers through interstate commerce." *Id*. As discussed above, the Ziegler facts will not be stricken, and Defendants cite no authority for the proposition that alleging fraudulent activity took place as Denkewalter does is insufficient. Defendants' next argument—that Denkewalter "completely fail[s] to describe the

content of the communications"—is simply untrue, since Denkewalter quotes from specific emails, in addition to attaching them to his SAC. Defendants then argue that Denkewalter has not specified whether the predicate acts took place via mail or wire, but the SAC frequently and consistently refers to "wire frauds" and the Defendants using "wire communications in interstate commerce" or "the interstate wire system." *See generally* Dkt. # 33. Finally, Defendants confusingly state that Denkewalter "fails to allege who made any of the communications." *Id*. Once again, the Courts points out that Denkewalter specifically describes emails and attaches them to his SAC, clearly showing the senders and recipients.

Because the Court finds that Denkewalter's RICO claim satisfies Rule 9(b), and describes the allegations with enough specificity to show the RICO claim is not "largely groundless," Defendants' Motion to Dismiss the RICO claim is denied.[2] *See Drobny*, 929 F. Supp. 2d at 844.

### b. Fraud

The Court next addresses Defendants' Motion to Dismiss Denkewalter's fraud claim in Count II of his SAC. We first note that both Defendants and Denkewalter seem

---

[2] The argument that Denkewalter's claim fails under Rule 9(b) is the only argument that Defendants adequately made. Although they state in passing in their briefs that Denkewalter attempts "to turn a simple alleged claim for breach of contract claim into a violation of the RICO statute," Dkt. # 47-2, at 1–2, Defendants do not support that argument with any case law. *See Zamora-Mallari v. Mukasey*, 514 F.3d 679, 694 n.7 (7th Cir. 2008) (argument unsupported by case law deemed forfeited).

to conflate the common law fraud claim with the RICO claim. Regardless, Denkewalter has sufficiently pleaded his fraud claim and we deny the Motion to Dismiss.

Count II of Denkewalter's SAC is for "Breach of Fiduciary Duty and Fraud," and first alleges breach of fiduciary duty by way of Defendants (1) using Denkewalter's credit cards, (2) defaulting on interested owed to Ziegler, (3) failure to pay Denkewalter sums that were owed to him, and (4) the dissipation of Ziegler's funds upon being refunded by Old Republic. Dkt. # 33, ¶ 59. Count II then specifically lays out the fraud claim:

> In addition to comprising a breach of their fiduciary duties, the aforesaid conduct *comprised a fraud upon Denkewalter insofar as it used intentional misstatements of intent to pay him, and concealment of asset diversion and credit card debt accumulation when there was a duty to disclose*, in order to deprive him of (i) property he otherwise could have taken action to protect in a timely fashion, and (ii) the chance to avoid significant debt claims by credit card issuers.

*Id.* ¶ 68 (emphasis added). Denkewalter's fraud claim therefore comprises two aspects: (1) a misstatement of fact; and (2) concealment in light of a duty to disclose. Defendants only move to dismiss the first aspect—misstatement of fact—and the Court therefore does not address fraudulent concealment.

A claim for fraudulent misrepresentation under Illinois law must allege: (1) a false statement of material fact, (2) defendant's knowledge that the statement was false, (3) defendant's intent that the statement induce plaintiff to act, (4) plaintiff's reliance on the truth of the statement, and (5) damages resulting from plaintiffs' reliance. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996).

17

Generally, "under Illinois law, statements regarding future events or circumstances are not a basis for fraud. Such statements are regarded as mere expressions of opinion or mere promises or conjectures upon which the other party has no right to rely." *Triumph Packing Group v. Ward*, 877 F. Supp. 2d 629, 645 (N.D. Ill. 2012) (cleaned up). But Illinois courts recognize an exception to this rule, where "the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *Id*. (cleaned up).

Defendants argue that the fraud claim must be dismissed because his allegation of "intentional misstatements of intent to pay him" amount to promissory fraud, or a promise of future conduct, which Illinois does not recognize as actionable. Dkt. # 47-2, at 7. In response, Denkewalter argues that Illinois law recognizes that "making a promise, while intending not to keep it at the time the promise is made, is actionable as a 'scheme to defraud' under Illinois law." Dkt. # 68, at 5. According to Denkewalter, "a 'scheme to defraud' is exactly what Denkewalter alleges." *Id*.; *see also id.* at 6–7 (describing how the SAC pleads a fraudulent scheme perpetrated against Denkewalter). For example, Denkewalter alleges that the misstatements of intent to pay him were made "with the intent and effect of inducing Denkewalter to delay pursuing his legal remedies while Thomas, Olswang and their companies continued to apply scarce monies elsewhere." Dkt. # 33, ¶ 47.

In their reply brief, Defendants make a series of confusing and unconvincing arguments completely unsupported by case law. *See* Dkt. # 71, at 6–7. They first argue

that "Defendants ran into financial difficulties due to the fact that their business is in commercial real estate" which was "devasted by" the COVID-19 pandemic, and that Denkewalter is attempting to turn "an inability to pay on simple contract obligations into a supposed sophisticated RICO scheme." *Id*. at 6. Next, they state that their approximately $90,000 charges to Denkewalter's credit cards "were obviously executed over a substantial period of time and not all at once" and that Denkewalter "obviously gave the individual Defendants his credit card to use, obviously he was aware over time that these charges were being incurred, and approved the use of the credit card and the charges." *Id*. at 7.

Defendants' arguments are either irrelevant or conclusory, and do not address whether, accepting the facts pleaded in the SAC as true, Denkewalter stated a claim for common law fraud. Nor have they sufficiently responded to Denkewalter's argument that he alleged a scheme to defraud. *See Zamora-Mallari*, 514 F.3d at 694 n.7 (argument unsupported by case law deemed forfeited). Furthermore, there are elements of the fraud claim that are statements of past and/or present fact, i.e., Thomas's statement that he "had worked out an agreement with AMEX which they supposedly sent to you." Dkt. # 33, ¶ 47. That allegation, in addition to Denkewalter's allegations that Defendants mislead him in order to delay his pursuit of legal remedies and continue misappropriating funds, support a plausible inference that Defendants' misrepresentations were part of a scheme to defraud Denkewalter. *See Triumph*, 877 F. Supp. at 645–46. The Court finds that, drawing all reasonable inferences in

Denkewalter's favor, he sufficiently alleged a misstatement of fact by Defendants and thus Denkewalter's fraud claim can survive. The Motion to Dismiss as to this claim is denied.

### c. Certain Defendants

Defendants also argue that all defendants except FDG, Thomas, and Olswang (i.e., the Entity Defendants) should be dismissed for failure to state a cause of action against them. They assert that Denkewalter fails to plead sufficient facts to "pierce the corporate veil" of the Entity Defendants and hold them liable for the acts of FDG, Thomas, and Olswang.

Defendants describe the allegations against the Entity Defendants as "general accusations" that "[a]t all relevant times, each [Entity] Defendant was a mere alter ego of FDG. Beyond that, Plaintiffs merely allege common ownership and office location." Dkt. # 47-2, at 3.[3] Furthermore, Defendants assert that "[t]he only other allegations regarding the [Entity] Defendants are that FDG set up the [Entity] Defendants to purchase and operate various real estate projects" and that "[t]here is nothing wrong with such a corporate structure." *Id*. at 3–4. Defendants argue that the SAC contains no allegations of a "unity of interest" and that their corporate structure is a "clearly acceptable practice in the real estate industry." *Id*. at 4–5. Finally, Defendants state that the "[Entity] Defendants are only linked by way of Plaintiff's allegations regarding

---

[3] Defendants refer to Entity Defendants as the "Third Party Defendants" in their briefs, but the Court will refer to them as Entity Defendants for consistency.

alleged mis-use [*sic*] of the Ziegler funds. Once the Ziegler allegations are taken out, there is no basis to hold these [Entity] Defendants liable for Plaintiff's claims for breach of contract and breach of fiduciary duty." *Id*. at 5.

Denkewalter argues in response that the SAC alleges that Thomas and Olswang control each of the Entity Defendants as managers and majority owners, the Entity Defendants were operated as alter egos of Thomas and Olswang, including by the "commingling of proceeds from the sales of properties, shared management, shared facilities, and operation toward the common purpose of enriching Thomas and Olswang through coordinated activity," and that monies owed to Ziegler and Denkewalter were used to benefit the Entity Defendants. Dkt. # 68, at 10–11.

Defendants have not sufficiently demonstrated that the Entity Defendants must be dismissed. They overgeneralize the allegations concerning these entities, skirting over the specific allegations laid out in the SAC describing how they acted as "alter egos" for FDG and/or Thomas and Olswang. And Defendants even acknowledge that the Ziegler allegations "link" the Entity Defendants to the claims at issue. Dkt. # 47-2, at 5. We therefore deny Defendants' Motion to Dismiss with respect to the Entity Defendants.

Defendants also argue that Thomas and Olswang should be dismissed from Count I for breach of contract since the claim is based on a written agreement between Denkewalter and FDG. While the breach of contract claim relies in part on an agreement between Denkewalter and FDG, it also alleges that FDG, *plus* Thomas and

21

Olswang individually, agreed to pay Denkewalter for the charges on his American Express card, which Defendants do not address. Denkewalter does not respond to Defendants' argument about Count I and thus waives his opposition. *See U.S. v. Holm*, 326 F.3d 872 (7th Cir. 2003) ("It is not the obligation of this court to research and construct the legal arguments open to parties," and "perfunctory and undeveloped arguments" are waived.); *Rose v. United States*, 929 F. Supp. 305, 309 (N.D. Ill. 1996) ("the paucity of argument on this issue in her response brief essentially waives the claim") (citing *Bakalis v. Golembeski*, 35 F.3d 318, 326 n. 8 (7th Cir. 1994)). Thus, Defendants' Motion is granted to the extent Count I relies on the agreement between Denkewalter and FDG, and Thomas and Olswang are dismissed from that aspect of the claim. The Motion is denied as to the alleged agreement by FDG, Thomas, and Olswang to pay for the American Express Charges.

## **CONCLUSION**

Defendants' Motion to Dismiss (Dkt. # 47) is granted-in-part and denied-in-part. Status hearing set for 6/1/2023 at 10:30 a.m. It is so ordered.

Dated: 5/16/2023

Charles P. Kocoras
United States District Judge