IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT DINKEWALTER                    )
AS EXECUTOR FOR KIM                   )
DENKEWALTER, DECEASED                 )
Plaintiffs/Counter-Defendant          )
                                      )
v.                                    )        Case No: 20-cv-5013
                                      )        Honorable Judge Charles P. Kocoras
                                      )        Magistrate Judge Jeffrey T. Gilbert
John Everest Thomas                   )
Et al.                                )
        Defendants/Counter-Plaintiffs )

Freedom Development                   )
Group, LLC                           )
John Thomas, Star Realty              )
        Counter-Plaintiffs           )
v.                                    )
                                      )
ROBERT Denkewalter                    )
AS EXECUTOR FOR KIM                   )
DENKEWALTER                           )
COUNTER-DEFENDANT                     )

**CERTAIN DEFENDANT/COUNTER-PLAINTIFF'S AMENDED MOTION FOR LEAVE
TO FILE  AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

NOW COMES, the Defendants/Counter-Plaintiffs, by and through his attorney,

Christopher A. Hansen, and moves the Court for the entry of an order granting them leave to

file their Amended Answer, Affirmative Defenses, and Counterclaim and in support thereof

states as follows: (Plaintiff's counsel stated in Court before Judge Gilbert he objects to filing).

1.  Certain Defendants (which are all named defendants except Daniel Olswang)  have  filed an

answer and affirmative defenses.

1

2.  Certain Defendants now seek to Amend the Answer and their Affirmative Defenses and Freedom Development Group, LLC, John Thomas, and Star Real Estate, LLC seek to file their counterclaim, , a copy of which is attached hereto as Exhibit A.

3. This Court has set a deadline of January 8, 2025 for all pleading amendments. Defendants are clearly within said time period to amend their answer and affirmative defenses, and file their counterclaim. Defendants understood the Court's ruling that Defendants had until said date (January 8, 2025) to amend any pleading or add any cause of action, including counterclaims. The law is clear within said time period (the deadline set by the Court) there should be no issue for amending and filing a counterclaim. The law is clear even after said deadline, amendments and favored to further the ends of justice.

3. Federal Rule of Civil Procedure 15(a) provides in part:

> (1) *Amending as a Matter of Course.* A party may amend its pleading once as a matter of course no later than:
>
> (A) 21 days after serving it, or
>
> (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.
>
> (2) *Other Amendments.* In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. **The court should freely give leave when justice so requires. (emphasis added)**

4.  Since Defendants are moving within the Court's amendment deadline order, there should be no question the amendment and counterclaim should be permitted. However, Plaintiff's counsel has indicated he will object to the filing and the only possible argument could be the timing. Defendants should not have to address this issue, since the motion to amend is within the Court's deadline. Movants can find no cases that address this due to its being beyond question. The

only cases found address the issue of filing a counterclaim after the Court's

deadline for amendments. Even after the deadline, the legal authority is clear the

counterclaim should be permitted. Defendants shall show the overwhelming right to

file their counterclaim by addressing the legal authority for filing a counterclaim

after the Court's deadline for amendments.

5. The decision to grant or deny a motion to file an amended pleading is a

matter purely within the sound discretion of the district court. Soltys v. Costello, 520 F.3d 737, 743

(7th Cir. 2008) (quoting Brunt v. Serv. Employees. Int'l Union 284 F. 3d 715, 720 (7th Cir. 2002).

"The Federal Rules of Civil Procedure [*9] adopt a liberal standard for amending: 'The

court should freely give leave when justice so requires.'" ). Life Plans, Inc. v. Sec. Life of Denver

Ins. Co., 800 F.3d 343, 357, (7th Cir. 2015) (quoting Fed. R. Civ. P. 15(a)(2). "The Supreme

Court has interpreted this rule to require a district court to allow amendment unless there is a good

reason—futility, undue delay, undue prejudice, or bad faith—for denying leave to

amend." Id. APC Filtration, Inc. v. Becker, No. 07-CV-146, 2009 U.S. Dist. LEXIS 5944, 2009 6, 2009) (citing Carroll v. Acme-Cleveland Corp., 955 F2d 1107, 1114 ( 7th Cir, 1992). As a judge in this district has observed:

> Fed.R.Civ.P. 15(a) allows parties to amend their pleadings and provides that this leave "shall be freely given when justice requires." Courts have interpreted these rules liberally, in furtherance of the goal of the Federal Rules to resolve disputes on the merits and in a single judicial proceeding whenever possible. The argument for amendment is especially compelling where the claim is compulsory. An amendment should not be denied merely due to the passage of time between the original filing and the attempted amendment. Jupiter Aluminum Corp. v. Home Ins. Co., 181 F.R.D. 605, 609 (N.D. Ill. 1998) (citations omitted).57-58 (citing Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L.Ed.2d 222 (1962)).
> Midwest's motion is more akin to the facts of Jupiter Aluminum Corp. v. The Home Ins. Co., 181 F.R.D. 605 (N.D. Ill. 1998). There, the district court allowed the defendant to file a counterclaim two years after the filing of the original complaint because of a number of factors, including: (1) the counterclaim was compulsory; (2) there was no bad faith, dilatory motive, or undue delay on the part of the defendant; and

(3) the plaintiff failed to demonstrate that it would be prejudiced by the filing. Id. at 609. The district court found the defendant's request especially compelling because the counterclaim was compulsory. Id. T&M has not argued, and nothing in the record indicates, that Midwest acted in bad faith or had a dilatory motive for waiting to file these counterclaims. Midwest's filing will not prejudice T&M as the parties are still engaged [*21] in discovery and the Court has yet to set a trial date. Though this Court has broad discretion to grant or deny a motion for leave to amend, the Court should grant when "justice so requires." Life Plans, Inc., 800 F.3d at 357 (quoting Fed. R. Civ. P. 15(a)(2)). Here, justice requires that the Court grant Midwest's motion to file both compulsory counterclaims. If the Court denies Midwest's motion, Midwest will forever lose the opportunity to bring possibly valid claims against *T&M. T&M Industrials v. Great Lakes Salt, Inc.*, 2016 U.S. Dist. LEXIS 21097 United States District Court for the Northern District of Illinois, Eastern Division February 22, 2016, Decided; February 22, 2016, Filed Case No. 15 C 3107 Reporter 2016 U.S. Dist. LEXIS 21097 * | 2016 WL 693231.But having to defend against Defendants' counterclaim is not the type of undue prejudice that mitigates in favor of denying motion for leave to amend. Rather, "'prejudice' is a reduction in the [nonmovant]'s ability to meet the [claim] on the merits." Global Tech. & Trading, Inc. v. Tech Mahindra Ltd., 789 F.3d 730, 732 (7th Cir. 2015)

This case is more compelling to permit the amendments and counterclaim, for it is before the Court's deadline for filing amendments. There is no bad faith or prejudice to the Plaintiff in Defendants filing their counterclaim. The facts giving rise to the counterclaim are already set forth in Defendants' affirmative defenses, so Plaintiffs are not taken by surprise or unduly burdened for they already have to defend these allegations. Finally, due to the Covid Virus Delay and the delay caused by Plaintiff Denkewalter's death and Plaintiff's counsel's almost year delay in deciding whether to proceed with this case, written discovery is just proceeding and Plaintiff is therefore not prejudiced in any way by adding the counterclaim at this time.

WHEREFORE, Certain Defendants prays for the entry of an order granting them leave to file their Amended Answer, Affirmative Defenses, and Counterclaim.

Respectfully Submitted,

Certain Defendants

By:    *Isl Christopher A. Hansen*
Their Attorneys

Christopher A. Hansen
318 W. Adams St. Ste. 1519
Chicago, Illinois 60606
(708) 284-6502
hansenlegal@yahoo.com
Attorney No. 52309

## CERTIFICATE OF SERVICE

I, Christopher A Hansen, an attorney, hereby certify that a true and accurate copy of this document therein  referred were served upon the below named counsel by electronic mail, before the hour of   4:00 p.m. on this 19th day of December, 2024.

/s/ Christopher A. Hansen

Christopher A. Hansen

## Service List

Gregg Minkow
1234 N. Wacker Dr., Ste. 250
Chicago, Il. 60606
Email: gminkow@minkowbergman.com

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT DENKEWALTER, | ) | |
| EXECUTOR OF KIM | ) | |
| DENKEWALTER, DECEASED | ) | |
|     PLAINTIFF | ) | |
| v. | ) | |
| | ) | Case No. 1:20-cv-5013 |
| JOHN THOMAS | ) | |
| Et. Al. | ) | |
|     DEFENDANTS | ) | |

————————————————

| | |
|---|---|
| Freedom Development | ) |
| Group, LLC | ) |
| John Thomas | ) |
|     Counter-Plaintiffs | ) |
| v. | ) |
| | ) |
| ROBERT DENKEWALTER | ) |
| EXEXUTOR OF KIM | ) |
| DENKEWALTER, DECEASED | ) |
| COUNTER-DEFENDANT | ) |

## AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM TO SECOND AMENDED COMPLAINT

NOW COME THE DEFENDANTS, by and through their attorney, Christopher A. Hansen,

JOHN EVERETT THOMAS, FREEDOM DEVELOPMENT GROUP, LLC, (FREEDOM

DEVELOPMENT GROUP, LLC- 87th STREET; FREEDOM DEVELOPMENT GROUP, LLC

-AURORA; FREEDOM DEVELOPMENT GROUP, LLC - NORTH AVENUE; FREEDOM

DEVELOPMENT GROUP, LLC-PITTSFIELD; FREEDOM DEVELOPMENT GROUP, LLC –

STARVED ROCK MARINA; FREEDOM DEVELOPMENT GROUP, LLC - WAUKEGAN);

FREEDOM DEVELOPMENT GROUP, LLC-ELGIN HOSPITAL, FREEDOM

1

DEVELOPMENT GROUP, LLC - ROUND LAKE, JET PARK, LLC, 901 CENTER

STREET HOLDINGS LLC, JET HOSPITALS LLC, TOT Holdings I LLC, TOT Holdings

II LLC, STAR REAL ESTATE, LLC, JET FOODS LLC, JET FOODS BISHOP LLC; JET

FOODS CAROL STREAM LLC; JET FOODS HARVEY LLC, JET FOODS

NAPERVILLE LLC, JET FOODS OAKTON LLC, JET FOODS PARK FOREST LLC, JET

FOODS ROCKFORD LLLC (hereinafter referred to as "Certain Defendants") and as their

Amended Answer to the Second Amended Complaint of Robert Denkewalter Executor for

KIM DENKEWALTER, deceased ("Denkewalter" or "Plaintiff") state as follows:

### Summary of Causes of Action

1.      This is a civil action arising under the federal Racketeer Influenced and Corrupt

Organizations Act ("RICO"), at 18 U.S.C. § 1962, based on a pattern of conduct by Defendants

John Everette Thomas and Daniel Olswang, and companies they control, using wire

communications in interstate commerce to defraud lenders, service providers, and business

associates out of funds loaned and entrusted to them, and property interests to which they were

entitled, and diverting such funds and interests to their own use surreptitiously, in repeated

violation of 18 U.S.C. § 1343 (the "Wire Fraud Statute").

       **ANSWER**: Defendants deny the allegations set forth in paragraph 1.

2.      On information and belief, the Defendants' pattern of wire frauds included using

funds belonging to others, in some cases solicited with promises they would be earmarked for

specific purposes, to instead (i) finance various other business operations managed by Thomas

and Olswang, (ii) pay restitution owed by Thomas as part of sentencing in a criminal case, which

was then publicized as proof of his good character to promote business opportunities for the

Defendant companies, and/or (iii) finance Thomas' (and possibly Olswang's) own lifestyles and

2

compensation from their companies.

ANSWER: Defendants deny the allegations set forth in paragraph 2.

3.      The Defendant companies, while supposedly separate entities, were actually mere alter egos of one another and of Thomas and Olswang, acting in a coordinated fashion to carry out the fraudulent intentions of Thomas and Olswang.

ANSWER: Defendants deny the allegations set forth in paragraph 3.

4.      Denkewalter brings this suit as one of the victims of the above-stated pattern of fraudulent conduct, and also seeks relief, in the alternative of his RICO count, under state common law for breach of fiduciary duty, fraudulent misrepresentation, and breach of contract. Denkewalter seeks relief in the form of damages and/or constructive trust.

ANSWER: Defendants deny the allegations set forth in paragraph 4.

### Jurisdiction and Venue

5.      The Court has original jurisdiction of the federal RICO claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

ANSWER: Defendants deny the allegations set forth in paragraph 5.

6.      Since the state law claims derive substantially from a common nucleus of operative fact as the federal claims, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

ANSWER: Defendants deny the allegations set forth in paragraph 6.

5.      Venue is proper under 28 U.S.C. § 1391(b)(l) and (2).

ANSWER: Defendants deny the allegations set forth in paragraph 7.

### Identities of the Parties

6.      KIM DENKEWALTER ("Denkewalter") was at all relevant times, and is currently, a resident of the City of Wheeling, in Cook County, Illinois, and is licensed to practice

3

law in Illinois.

>**ANSWER**: Defendants admit the allegations set forth in paragraph 3.

5.　　JOHN EVERETT THOMAS ("Thomas") was at all relevant times, and is presently, a resident of the State of Illinois, working regularly from offices at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607.

>**ANSWER**: Defendants deny the allegations set forth in paragraph 5.

6.　　DANIEL OLSWANG ("Olswang") was at all relevant times, and is presently, a resident of the State of Illinois, working regularly from offices at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, and is licensed to practice law in Illinois.

>**ANSWER**: Defendants deny the allegations set forth in paragraph 6.

5.　　Thomas' initials, "JET," appear in the names of numerous Defendant companies of which, according to the Illinois Secretary of State's records, Thomas, Olswang, or both of them were Managers at all relevant times.

>**ANSWER**: Defendants admit the allegations set forth in paragraph 5.

6.　　FREEDOM DEVELOPMENT GROUP, LLC ("FDG") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on May 22, 2017, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of which Thomas and Olswang are Managers currently and were Managers at all relevant times.

>**ANSWER**: Defendants deny the allegations set forth in paragraph 6.

7.　　FREEDOM DEVELOPMENT GROUP, LLC - 87TH STREET; FREEDOM DEVELOPMENT GROUP, LLC -AURORA; FREEDOM DEVELOPMENT GROUP, LLC - NORTH AVENUE; FREEDOM DEVELOPMENT GROUP, LLC- PITTSFIELD; FREEDOM DEVELOPMENT GROUP, LLC - STARVED ROCK MARINA; and FREEDOM

4

DEVELOPMENT GROUP, LLC- WAUKEGAN were at all relevant times series of FDG, with Thomas and Olswang as Managers.

ANSWER: Defendants deny the allegations set forth in paragraph 7 as a legal conclusion.

8.      FREEDOM DEVELOPMENT GROUP, LLC - ELGIN HOSPITAL was an Illinois limited liability company formed on May 6, 2019, but shown by the Illinois Secretary of State as involuntarily dissolved on December 4, 2020 with Olswang as its Manager and principal offices at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607.

ANSWER: Defendants admit the allegations set forth in paragraph 8.

9.      FREEDOM DEVELOPMENT GROUP, LLC - ROUND LAKE was an Illinois limited liability company fanned on November 12, 2018, but shown by the Illinois Secretary of State as involuntarily dissolved on September 29, 2020 with Thomas and Olswang as its Managers and principal offices at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607.

ANSWER: Defendants admit the allegations set forth in paragraph 9.

10.     JET PARK, LLC ("JET Park") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on November 2, 2017, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of which Thomas and Olswang have been Managers at all relevant times.

ANSWER: Defendants deny the allegations set forth in paragraph 10.

11.     901 CENTER STREET HOLDINGS LLC ("901 Center") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on August 28, 2019, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of which Thomas has been Manager at all relevant times.

ANSWER: Defendants deny the allegations set forth in paragraph 11.

5

12.     JET HOSPITALS LLC ("JET Hospitals") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on April 14, 2020, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of which Thomas has been Manager at all relevant times.

ANSWER: Defendants deny the allegations set forth in paragraph 12.

13.     TOT Holdings I LLC ("TOT Holdings I") was at all relevant times, and is currently, a limited liability company formed 1mder the laws of the State of Illinois on July 18, 2019, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of which Olswang has been Manager at all relevant times.

ANSWER: Defendants deny the allegations set forth in paragraph 13.

14.     TOT Holdings II LLC ("TOT Holdings II") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on July 18, 2019, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of which Thomas and Olswang have been Managers at all relevant times.

ANSWER: Defendants deny the allegations set forth in paragraph 14.

15.     STAR REAL ESTATE, LLC ("Star Realty") was at all relevant times a limited liability company formed under the laws of the State of Illinois on July 3, 2013, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, whose status was listed by the Illinois Secretary of State as "terminated" on September 4, 2019 with Olswang as Manager, but which has been re-organized as of September 18, 2020, again with Olswang as Manager and with the same principal office on Van Buren.

ANSWER: Defendants deny the allegations set forth in paragraph 15.

16.     JET FOODS LLC ("JET Foods") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on May 24, 2019, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of which Thomas and

6

Olswang are Managers.

      **ANSWER**: Defendants deny the allegations set forth in paragraph 16.

    17.    JET FOODS BISHOP LLC ("JET Foods Bishop") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on October 22, 2019, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of which Thomas and Olswang are Managers.

      **ANSWER**: Defendants deny the allegations set forth in paragraph 17.

    18.    JET FOODS CAROL STREAM LLC ("JET Foods Carol Stream") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on July 7, 2020, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of which Olswang is Manager.

      **ANSWER**: Defendants deny the allegations set forth in paragraph 18.

    19.    JET FOODS HARVEY LLC ("JET Foods Harvey") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on January 30, 2020, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of which Olswang is Manager.

      **ANSWER**: Defendants deny the allegations set forth in paragraph 19.

    20.    JET FOODS NAPERVILLE LLC ("JET Foods Naperville") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on March 16, 2020, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of which Thomas and Olswang are Managers.

      **ANSWER**: Defendants deny the allegations set forth in paragraph 20.

    21.    JET FOODS OAKTON LLC ("JET Foods Oakton") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on March 27, 2020, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of

which Thomas and Olswang are Managers.

      **ANSWER**: Defendants deny the allegations set forth in paragraph 21.

22.     JET FOODS PARK FOREST LLC ("JET Foods Park Forest") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on June 10, 2019, with its principal office at 138 S. Orchard Drive, Park Forest, Illinois 60466, of which Olswang is Manager.

      **ANSWER**: Defendants deny the allegations set forth in paragraph 2.

23.     JET FOODS ROCKFORD LLC ("JET Foods Rockford") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on September 23, 2020, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of which Olswang is Manager.

      **ANSWER**: Defendants deny the allegations set forth in paragraph 23.

24.     JET STRUCTURES LLC ("JET Structures") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on July 22, 2019, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, of which Thomas and Olswang are Managers.

      **ANSWER**: Defendants deny the allegations set forth in paragraph 24.

### Unity of Interest and Commingling Among the Defendants

25.     On information and belief, Thomas was the founder and, directly or through a trust controlled by him, the majority owner of all the Defendant companies, except insofar as certain large lenders or investors subsequently may have come to have equity interests in certain of the companies.

      **ANSWER**: Defendants deny the allegations set forth in paragraph 25.

26.     Since on or before March 29, 2019, Thomas and Olswang have been the sole Managers of FDG, according to records of the Illinois Secretary of State.

**ANSWER**: Defendants admit the allegations set forth in paragraph 26.

27.     FDG, controlled by Thomas and Olswang, is, and has been since its inception, the flagship through which Thomas and Olswang have operated and promoted their businesses in real estate acquisition and development, real estate brokerage, grocery stores, and construction.

**ANSWER**: Defendants deny the allegations set forth in paragraph 27.

28.     The FDG website, and the way Thomas and Olswang have conducted their businesses, have long blurred or eliminated any corporate veils ostensibly separating the various Thomas and Olswang companies.

**ANSWER**: Defendants deny the allegations set forth in paragraph 28.

29.     Thus, for example, Defendant JET Park was a mere alter ego of FDG, formed by FDG's owners as FDG's designated vehicle for the purchase and resale of certain real estate formerly used as a commercial parking structure on the waterfront in St. Paul, Minnesota, commonly known as the RiverCentre Parking Ramp (hereinafter the "Parking Ramp"). The FDG website (*see* web page attached as **Exh. 1)** showed the Parking Ramp as part of the "Freedom Development Group Portfolio" (on p. 1O); the $250,000.00 down payment or earnest money for JET Park's intended purchase of the Parking Ramp came from funds loaned to FDG under the Promissory Note attached as **Exh. 2,** but transferred to JET Park's escrowee, Old Republic National Title Insurance Company.

**ANSWER**: Defendants deny the allegations set forth in paragraph 29.

30.     Similarly, Defendant 90I Center was a mere alter ego of FDG, formed by FDG's owners as FDG's designated vehicle for the purchase and operation of certain Illinois real estate which had previously been the site of Sherman Hospital in Elgin, Illinois. The site - also shown in Exh. 1 as part of *FDG S* portfolio (on p. 25) -  was designated earlier this year for use as a COVID-19 treatment center by the State of Illinois, but the State dropped that intention after

investing significant sums on improvements to the property. Subsequent eminent domain litigation to establish compensation due 901 Center for the State's temporary "taking" of the property resulted in a Payout Order **(Exh. 3)** which directed over $1 Million to TOT Holdings I, yet another of Thomas' and Olswang's companies, which is a Defendant here but was not even a party to the eminent domain case, showing again a complete commingling of finances and business affairs.

ANSWER: Defendants deny the allegations set forth in paragraph 30.

31.     At all relevant times, Defendant JET Hospitals was also a mere alter ego of FDG, formed by FDG's owners as FDG's designated vehicle for the purchase and operation of certain Illinois real estate which had previously been the site of Westlake Hospital in Melrose Park, Illinois. The site was designated earlier this year for use as a COVID-19 treatment center by the State of Illinois, and JET Hospitals contracted on April 28, 2020 to purchase the site and lease it to the State of Illinois by way of a Court-ordered sale in the United States Bankruptcy Court for the Northern District of Illinois, Case No. 19 B 22878, for the sum of $12 million. The contract, attached as **Exh. 4,** was signed by Thomas as Managing Member of JET Hospitals (on p. 19), and directed notices intended for JET Hospitals to be sent to Thomas "c/o Freedom Development Group" (on p. 14). While JET Hospitals subsequently terminated the contract, the document required it to make an earnest money deposit of $1.2 million toward the purchase (on p. 2), which on information and belief the company did in fact pay, and that money was presumably refunded to JET Hospitals or such other persons as it may have directed.

ANSWER: Defendants deny the allegations set forth in paragraph 31.

32.     Meanwhile, Defendant Star Realty was a mere alter ego of FDG, formed by FDG's owners for the purpose of brokering commercial real estate sales. The FDG website (in **Exh. 5)** listed Star Realty - along with the Defendant JET Structures, a construction company,

10

and Defendant JET Foods, a grocery chain - as FDG's "subsidiaries," while Exh. 1 (also from the FDG website) listed virtually every property for which a separate Defendant company is named as part of the *"Freedom Development Group* Portfolio" (emphasis added). The FDG website (in **Exh. 6**) listed Thomas as "CEO - Managing Principal," and Olswang as shown as "President - Principal," for the entire, over-arching FDG operation.

> **ANSWER**: Defendants deny the allegations set forth in paragraph 32.

33.     With the exception of JET Foods Park Forest, at all relevant times, all the Defendant companies have had the same principal office, and all have had Olswang as their registered agent.

> **ANSWER**: Defendants deny the allegations set forth in paragraph33.

34.     From the formation of FDG on May 22, 2017 until on or about August 2, 2018 (formalized in writing on or about September 13, 2018), Denkewalter was a Manager and minority-owning Member of FDG. On or about September 13, 2018, Denkewalter formally resigned as Manager of FDG, and relinquished all but a 2% Membership Interest in FDG, a 30% Membership Interest in Star Realty, and 2.5% of FDG's interest in Questar, Inc., pursuant to a written agreement with FDG **(Exh. 7)**, signed by Thomas on FDG's behalf.

> **ANSWER**: Defendants admit the allegations set forth in paragraph 34.

### FDG's and Its Affiliates' Fraudulent Misuse of Other People's Money Under Thomas and Olswang

35.     It takes money to run FDG's various businesses, and Thomas and Olswang have repeatedly run those businesses with money belonging to others, fraudulent obtained or fraudulently diverted through the use of the interstate wire system.

> **ANSWER**: Defendants deny the allegations set forth in paragraph 35.

36.     While discovery is pending to ascertain how specific funds were misused, money is fungible, and money obtained or retained through fraudulent means and then used to pay routine business expenses or to compensate Thomas and Olswang as Managers is no different

11

than monies misused to acquire real property or other assets, since it frees up other funds to facilitate such acquisitions.

**ANSWER**: Defendants deny the allegations set forth in paragraph 36.

37.     In January 2018, prior to the 25th day of that month, Plaintiff Denkewalter, and a business associate of his, Michael Ziegler, met with Thomas and Rick DiMaria, a sometime fundraiser for Thomas and his projects, at Hackney's restaurant on Lake Avenue in Glenview, Illinois, to discuss the possibility of Ziegler loaning FDG the sum of $250,000.00.00 to be used as the earnest money for FDG's planned purchase, directly or through JET Park, of the St. Paul Parking Ramp referenced above.

**ANSWER**: Defendants admit the allegations set forth in paragraph 37.

38.     At the meeting, Thomas described his past development experience, and his plan for the purchase of the Parking Ramp, and told Ziegler that Thomas already had buyers lined up to purchase the Parking Ramp from FDG on a resale or "flip" after FDG procured the property.

**ANSWER**: Defendants deny the allegations set forth in paragraph 38.

39.     At the meeting, Ziegler and Thomas agreed that Ziegler would loan FDG the $250,000.00.00, to be used solely for earnest money on FDG's procurement of the Parking Ramp, in exchange for repayment when the "flip" was completed, along with interest at the rate of 2.4% per year (payable every February), a preferred right to receive the first $250,000.00 as an additional return on his loan, and 10% of any profit received by FDG in excess of $4 million through the purchase and resale or flip of the Parking Ramp.

**ANSWER**: Defendants deny the allegations set forth in paragraph 39.

40.     Shortly after the meeting, the terms of the loan were memorialized in a document entitled "Unsecured Promissory Note" (Exh. 2, referenced above), which Denkewalter signed

on FDG's behalf, pursuant to Thomas' direction as majority owner, on January 25, 2018. That same day, Ziegler transferred the $250,000.00 amount to Denkewalter's attorney trust account (also known as an "IOLTA account"), and Denkewalter promptly thereafter transferred the funds to an account held by Old Republic National Title Insurance Company ("Old Republic") as the escrow agent for FDG's purchase of the Parking Ramp from its owner, the Port Authority of the City of St. Paul (tl1e "Port Authority").

      **ANSWER**: Defendants admit the allegations set forth in paragraph 40.

      41.    The purchase of the Parking Ramp was aborted after the Minnesota Court of Appeals held, on October 28, 2019, certain Port Authority bondholders had a right to accelerate repayment of the bond debt or hold the purchaser liable, and that another party had a right of first refusal to buy the Parking Ramp in place of FDG or its proxy, JET Park. As a result, the contract between the Port Authority and JET Park was terminated, and at some point, in November 2019, Old Republic returned the earnest money to either FDG, JET Park, or persons then in control of those entities. However, instead of returning the earnest money to Ziegler (since the express purpose for which he had loaned FDG the money had ceased to exist)- and despite repeated requests by Denkewalter for the Promissory Note to be honored and for information on the money's whereabouts - Thomas and Olswang diverted Ziegler's $250,000.00 to other purposes, and hid from Denkewalter and Ziegler the uses to which the money was put after Old Republic returned it to FDG from the escrow.

      **ANSWER**: Defendants deny the allegations set forth in paragraph 41.

      42.    Indeed, Thomas explicitly told Denkewalter that in the event the purchase of the Parking Ramp was not consummated, Ziegler's loan principal would be promptly returned to the Denkewalter IOLTA account from which it had been transferred to Old Republic, and confirmed this in writing by way of his notes in an outline of terms for Denkewalter's departure

from his active role in FDG **(Exh. 8** - *see* the phrase "Kim's IOLTA" in lower righthand corner,

with line connecting it to the phrase "200 + 250 to close - Mike Ziegler"), and in the signed

final depaiture agreement with Denkewalter (Exh. 7, referenced above, at ‚ℾ 4 of its internal Exh.

A), both sent to Denkewalter via email using the interstate wire system. However, when

Denkewalter thereafter repeatedly asked Thomas and Olswang the status of the earnest money

that rightfully belonged to Ziegler, they repeatedly rebuffed him by way of emails telling him to

"Stop sending emails and calling which is just disrupting everyone" (in **Exh. 9** from Thomas on

February 22, 2019), and "Constantly calling our office and harassing the staff is not

appreciated" (in **Exh.10** from Olswang on July 18, 2019).[1] Olswang did, however, promise to

let Ziegler know if there was any change, stating in Exh. 10:

---

[1] Exhibits not authored by Denkewalter are attached and referenced to show their content, but Denkewalter does not necessarily adopt such content as his own allegations of fact except as expressly stated in the main body of this Second Amended Complaint.

> "There is nothing to report on St. Paul. We CANNOT close until Seller can deliver clean title which they still cannot do, Once things change I will let Mime [sic] know."

> **ANSWER**: Defendants deny the allegations set forth in paragraph 42.

43.    At all times, Thomas and Olswang knew Denkewalter was inquiring about

Ziegler's funds on Ziegler's behalf, and that Ziegler would be looking to Denkewalter for

information from FDG about his funds. On December 4, 2019, when Denkewalter still had not

received information from Thomas and Olswang, he attempted to find out from Old Republic

the status of the attempt to purchase the Parking Ramp. Although Old Republic refused to give

Denkewalter many details, a representative did inform Denkewalter that the purchase contract

had been terminated, and that the earnest money had been returned to unspecified persons -

important information about which Thomas and Olswang failed to infonn Ziegler, contrary to

Olswang's promise in Exh. 10. Consequently, on December 4, 2019, Denkewalter wrote to

Thomas and Olswang (in **Exh. 11,** on p. 2 thereof), starting as follows: "Please advise how I can get the Zeigler [sic] deposit this week. I understand that the contract was terminated last month. I would have thought you would contact me. Please don't tell me you have misappropriated the Zeigler funds."

> **ANSWER**: Defendants deny the allegations set forth in paragraph 43

44. As it turned out, Thomas and Olswang had indeed dissipated the Ziegler funds immediately after they were refunded by Old Republic, and to this day have not disclosed how they were diverted and misused, although on information and belief the money was used directly or indirectly for one or more of the following purposes: [2]

    a. As part of the $1.2 million earnest money deposited for Defendant JET Hospitals' attempt to buy the former Westlake Hospital site, as discussed above.

---

[2] Denkewalter also repeatedly sought information about the company's tax calculations for 2018 so that he could complete his personal tax returns for that year. Thomas, Olswang, and FDG have, in fact, withheld all such information from Denkewalter for 2018 and 2019 (the 2020 Form K-1 not yet being due), in an apparent further effort to conceal their activities.

    b. Funding 901 Center's eminent domain litigation against the State which resulted in a $4 Million recovery for 901 Center's designees under Exh. 3 (also discussed above).

    c. Payment of Thomas' restitution to the Village of Riverdale, Illinois pursuant to a criminal conviction, based on his sudden increase in payments to Riverdale in the months immediately after Old republic refunded Ziegler's money to the companies Thomas and Olswang controlled. Thomas was convicted in 2015 of stealing $375,000.00 in Riverdale taxpayer money earmarked to develop a marina in the Village, and ordered to pay restitution in addition to a jail sentence. According to Village records **(Exh. 12),** provided under the Illinois Freedom of Information Act, Thomas paid $75,000.00 in restitution on February 25, 2016, and only another $47,125.00 over the next three years. However, the Village received restitution on Thomas' account in the amounts of $45,000.00 on December 3, 2019, $75,000.00 on January 6, 2020, and $25,000.00 on February 10, 2020 - *a total of $145,000.00 in the roughly 3-month period immediately following Old Republic's November 2019 refund of Ziegler's $250,000.00 to the companies Thomas controlled.*

    d. Acquisition or improvements to other properties and businesses controlled by Thomas, Olswang, and FDG.

**ANSWER**: Defendants deny the allegations set forth in paragraph 44.

45.     Even the use of Ziegler's funds to pay Thomas criminal restitution would have been an investment in FDG's and its affiliates' businesses.  On May 18, 2020, the *Chicago Sun-Times* (in **Exh. 13)** wrote about FDG's purchase of the Sherman Hospital property and Thomas' criminal past as follows:

> "This gets into what Thomas wants to convey about himself, to the public or anyone liable to do business with him. Thomas said last week he's almost done making restitution to Riverdale. 'I've paid over $300,000. My final payment of $90,000 will be made in the next two weeks. Not many guys make their restitution,' he said."

Thus, if Thomas and other Defendants misused Ziegler's $250,000.00 at least in part to pay Thomas' restitution - as appears likely - it was just an advertising or public relations investment in the Defendant companies, to prop up Thomas' image and make it more palatable both for governments (like the State) and private investors to do business with FDG and its affiliates.

**ANSWER**: Defendants deny the allegations set forth in paragraph 45.

46.     Meanwhile, Thomas and Olswang surreptitiously used American Express and Discover credit cards in Denkewalter's name - after his departure as a Manager - to run up significant debts for FDG business expenses as well as meals, ridesharing, and other living expenses, including expenses of Thomas' then girlfriend, creating $84,594.22 in charges to Denkewalter's American Express credit card (the bills for which were sent to FDG's address on Van Buren in Chicago, and were thus unknown to Denkewalter until well after they were incurred), plus $4,086.15 in charges to his Discover credit card, including interest and late fees, which the credit card issuers have demanded from Denkewalter. [3]

**ANSWER**: Defendants deny the allegations set forth in paragraph 46.

47.     While Thomas emailed Denkewalter in Exh. 9 stating, "We will be working out a deal with Amex, you and your investor," and in Exh. 10 stating, "I had worked out an agreement

16

with AMEX which they supposedly sent to you" and "As we agreed, we will pay the AMEX bill," those statements, on information and belief, were knowingly false and made solely with the intent and effect of inducing Denkewalter to delay pursuing his legal remedies while Thomas, Olswang and their companies continued to apply scarce monies elsewhere.

   **ANSWER**: Defendants deny the allegations set forth in paragraph 47.

  48.  Concurrently, Denkewalter's departure agreement with FDG (Exh. 7) required FDG to pay Denkewalter $250,000.00 by March 31, 2019 (under its internal Exh. A, at ¶ 3); amend the Operating Agreement for its Star Realty affiliate so as to give Denkewalter a 30% membership interest (Exh. 3, at internal Exh. A, ¶ 5), which implied an agreement by FDG to ensure that Denkewalter would be paid his share of distributions resulting mainly or wholly from the subsequent sale of property on Superior Avenue in Chicago, which came to $30,000.00. The $250,000.00 was never paid, and Star Realty was subsequently "terminated," according to the Illinois Secretary of State, so the funds belonging to Denkewalter were presumably misappropriated to the company's other members, Cast Iron Trust (of which Thomas, on information and belief, is the primary beneficiary), and Olswang.

   **ANSWER**: Defendants deny the allegations set forth in paragraph 48.

  49. In addition, depending on how Exh. 3's internal Exh. A,   2 is interpreted, another $250,000.00 is owed to Denkewalter either presently, due to the "sale" of the property known as "Ecolab" to FDG or one of its affiliates, or will be due Denkewalter upon the resale of that property *by* FDG sometime in the future.

   **ANSWER**: Defendants deny the allegations set forth in paragraph 49.

<u>**COUNT I - BREACH OF CONTRACT**</u>

  50. Denkewalter incorporates herein by this reference paragraphs I through 49, above.

   **ANSWER**: Defendants incorporates herein by reference their answers to

17

paragraphs 1 through 49 above.

51.     Denkewalter agreed to relinquish all but 2% of his Membership Interest in FDG on or before September 13, 2018.

ANSWER: Defendants denies the legal conclusions set forth in paragraph 51.

52.     In consideration thereof, FDG promised to pay Denkewalter certain the sums at stated times, and to provide Denkewalter with minority interests in certain entities under common control with FDG.

ANSWER: Defendants denies the legal conclusions set forth in paragraph 52.

53.     The tenns of the aforesaid exchange of promises were accurately memorialized in Exh. 7, signed by Denkewalter, and by Thomas as Manager on behalf of FDG, on information and belief in consultation with Olswang.

ANSWER: Defendants denies the legal conclusions set forth in paragraph 53.

54.     FDG breached Exh. 7 by failing to pay the sum of $250,000.00 by March 31, 2019 as required under Exh. 7, at internal Exh. A,   3; by failing to ensure that Star Realty paid Denkewalter his share of distributions, at $30,000.00 for his 30% share of a property sale on Superior in Chicago, as impliedly required by Exh. 7, at internal Exh. A,   5; and potentially another $250,000.00 by reason of the sale of Ecolab to FDG.

ANSWER: Defendants deny the allegations set forth in paragraph 54.

55.     Denkewalter has thus been damaged in the principal sum of at least $280,000.00, or as much as $530,000.00, as a result of the aforesaid breaches ofExh. 7, plus lost earnings on the funds that have been denied him.

ANSWER: Defendants deny the allegations set forth in paragraph 55.

56.     Denkewalter has performed all conditions on his part entitling him to payment of the sum referenced above, and any other performance under Exh. 7 due from FDG.

ANSWER: Defendants deny the allegations set forth in paragraph 56.

18

57.     Further, Exh. 10 demonstrates that FDG, through its President, Olswang, and Thomas and Olswang individually, through Olswang as their spokesperson, agreed to pay the American Express charges in the sum of $84,594.22, which they have not in fact paid despite Denkewalter having performed any conditions on his part to such payment.

ANSWER: Defendants deny the allegations set forth in paragraph 57.

WHEREFORE, Certain Defendants request judgment against the Plaintiff costs of suit; and such other relief as is just.

### COUNT II - BREACH OF FIDUCIARY DUTY AND FRAUD

58.     Denkewalter incorporates here by this reference paragraphs 1 through 57, above.

ANSWER: Defendants incorporates herein by reference their answers to paragraphs 1 through 57 above.

59.     As shown by (i) the surreptitious reliance on Denkewalter's credit cards by Thomas, Olswang, and FDG, (ii) FDG's default on paying interest to Ziegler when due under Exh. 2, (iii) its failure to pay Denkewalter the sums due him on March 31, 2019 under Exh. A of Exh. 7, and (iv) the dissipation of Ziegler's funds as soon as they were refunded by Old Republic, FDG has likely been insolvent (i.e., unable to pay its just debts as they come due) throughout 2019 and continuing into the present.

ANSWER: Defendants denies the legal conclusions set forth in paragraph 59.

60.     With FDG thus having entered the zone of insolvency, the company and its Managers, Thomas and Olswang, owed a fiduciary duty to creditors like Denkewalter to protect what assets the company had, and deploy them toward satisfying those creditors' rights rather than concealing or diverting the funds to other purposes like the continued acquisition of more real property and other assets, at the expense of the existing creditors.

19

**ANSWER**: Defendants denies the legal conclusions set forth in paragraph 60.

61.     Those fiduciary duties also included a duty of candor and honesty toward Denkewalter, including the duty to promptly communicate, rather than conceal, information about the disposition of the monies owed to him.

**ANSWER**: Defendants denies the legal conclusions set forth in paragraph 61.

62.     In addition, Thomas and Olswang owed Denkewalter, a minority Member of FDG, a statutory fiduciary duty of good faith and fair dealing under the Illinois Limited Liability Company Act (at 805 ILCS 180/15-3(g)(2) and (d)), which included a duty to keep Denkewalter informed of significant company events, especially those he had asked about or which involved running up debt on credit cards for which they knew Denkewalter would incur claims from card issuers if not actual liability to them.

**ANSWER**: Defendants denies the legal conclusions set forth in paragraph 62.

63.     Further, under 805 ILCS 180/15-3(g)(2) and (b)(l), Thomas and Olswang owed Denkewalter a duty to account to FDG (of which Denkewalter remains a minority Member), and to hold as trustee for it, any property, profit, or benefit derived by them in the conduct of the company's business or derived from a use of the company's property.

**ANSWER**: Defendants denies the legal conclusions set forth in paragraph 51.

64.     Thomas and FDG never intended when Thomas signed Exh. 7 to comply with the tenns referenced above. Rather, Exh. 7 was used by Thomas and FDG as part of a fraudulent scheme to exclude Denkewalter from participation in and knowledge of the activities of Thomas, Olswang, FDG, and its affiliates, so that they could surreptitiously buy and profit from Ecolab and other properties without Denkewalter receiving his share of the benefits due him as a 27% Member in FDG prior to the execution of Exh. 7, and surreptitiously obtain the benefit of Denkewalter's credit cards for their benefit at his expense.

**ANSWER**: Defendants denies the allegations set forth in paragraph 64.

20

65.     On information and belief, Thomas, Olswang, FDG, and its Co-Defendant affiliates surreptitiously diverted the sums due Denkewalter but unpaid under Exh. 7 to make further investments, directly or indirectly, in acquiring more property or to pay the expenses of monetizing those properties or compensating Thomas and Olswang, by which Thomas, Olswang, and the Defendant companies all were unjustly emiched at Denkewalter's expense.

ANSWER: Defendants denies the allegations set forth in paragraph 65.

66.     In addition, Thomas and Olswang, as the persons in control of Star Realty, had responsibility for ensuring that distributions of profits were made in proportion to ownership interests, but they instead withheld from Denkewalter at least the $30,000.00 owed to him from the Superior Avenue sale by reason of his 30% Membership Interest.

ANSWER: Defendants denies the legal conclusions set forth in paragraph 66.

67.     All the foregoing acts comprised oppression of Denkewalter as a non-managing Member ofFDG, as well as bad faith and unfair dealing toward Denkewalter, misuse of Denkewalter's property interests in (i) the consideration promised in exchange for a 25% Membership Interest in FDG and (ii) his credit cards, all for the selfish aggrandizement of Thomas and Olswang personally, in violation of 805 ILCS 180/15-3(g)(2), (d), and (b)(1).

ANSWER: Defendants denies the legal conclusions set forth in paragraph 67.

68.     In addition to comprising a breach of their fiduciary duties, the aforesaid conduct comprised a fraud upon Denkewalter insofar as it used intentional misstatements of intent to pay him, and concealment of asset diversion and credit card debt accumulation when there was a duty to disclose, in order to deprive him of (i) property he otherwise could have taken action to protect in a timely fashion, and (ii) the chance to avoid significant debt claims by credit card issuers.

ANSWER: Defendants denies the legal conclusions set forth in paragraph 68.

69.     Denkewalter has suffered damages as a proximate result of the abovementioned

21

acts and omissions, including loss of the value of his Membership Interest in FDG that existed prior to September 13, 2018 (having a value in excess of $530,000.00), the unpaid sum of the charges by Thomas, FDG, and/or Olswang on Denkewalter's credit cards (in excess of $88,000.00) to whatever extent he is or has been compelled to pay them, damage to his creditworthiness as evaluated by potential lenders, and otherwise.

**ANSWER**: Defendants denies the allegations set forth in paragraph 69.

70.    The actions of Thomas, FDG, and Olswang were undertaken with malice and a reckless disregard for Denkewalter's rights.

**ANSWER**: Defendants denies the legal conclusions set forth in paragraph 70.

WHEREFORE, Certain Defendants request judgment against the Plaintiff costs of suit; and such other relief as is just.

## COUNT III - VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

71.    Denkewalter incorporates here by this reference paragraphs 1 through 70, above.

**ANSWER**: Defendants incorporates herein by reference their answers to paragraphs 1 through 70 above.

72.    The FDG family of interrelated companies is an enterprise though which Thomas and Olswang engaged in racketeering as described in this Second Amended Complaint.

**ANSWER**: Defendants denies the legal conclusions set forth in paragraph 72.

73. The above-described conduct variously by Thomas, Olswang, and FDG- the misrepresentations that Ziegler would be kept informed and that his money would be repatriated when the Parking Ramp purchase contract tenninated, the surreptitious diversion of the monies when refunded by Old Republic, the withholding of information from Denkewalter in order to hide the contract termination and refund until their diversion of the Ziegler money was complete, the surreptitious funding of their businesses and lifestyles by charging

Denkewalter's credit cards and misapplying sums disingenuously promised to him for a buyout of his interests, the misrepresentations about having made a plan with American Express to pay off that card debt, and the promise to pay that debt (which, on information and belief, Olswang knew, at the time of the promise, the Defendants would not honor)- all comprised frauds within the meaning of the federal wire fraud statute, at 18 U.S.C. § 1343, all undertaken by Thomas, Olswang, FDG, and FDG's Co-Defendant affiliated companies as described above, with the intent and effect of defrauding Ziegler and Denkewalter, respectively, and thereby producing the losses described above.

 **ANSWER**: Defendants denies the allegations set forth in paragraph 73.

 74. Indeed, "fraud" under the plain language of the statute includes "fraudulent pretenses ... or promises," and is broadly defined so as not to even require an affirmative misrepresentation of fact, but rather includes "concealment of a material fact," extends to injured parties who were not directly the audience for a false statement or omission, applies whether or not the defrauder owes a fiduciary duty to the defrauded, and includes any "plan, design, or program of action" "to cheat or trick," or "to deprive of a right or property by fraud" where "fraud" means "deceit, trickery, or breach of confidence, used to gain some unfair or dishonest advantage." *See United States v. Varley,* 420 F. Supp. 3d 784, 794-799 (N.D. Ill. 2019).

 **ANSWER**: Defendants denies the allegations set forth in paragraph 69.

 75. Further, the frauds asserted here could not have been accomplished without the use of interstate wire services to fraudulently take control of funds in the first place: *e.g.,* obtaining Ziegler's earnest money funds from a Minnesota-based title insurance company; credit card charges accomplished through interstate wires for charge processing; and the coverup messages sent via the interstate Internet system. Wire fraud includes any instructions to the Minnesota-based title company to direct the return of Ziegler's money to Defendants instead of Denkewalter's IOLTA account (from where they originated) as Thomas had promised, or false

pretenses to credit card companies via electronic charges on Denkewalter's credit cards while omitting to tell the card processors or merchants that Denkewalter no longer authorized their use.

ANSWER: Defendants denies the allegations set forth in paragraph 75.

76.     As such, each of the aforementioned acts comprised wire fraud in violation of the aforementioned 18 U.S.C. § 1343.

ANSWER: Defendants denies the legal conclusions set forth in paragraph 76.

77.     Meanwhile, two or more such wire fraud violations within a 10-year period, as asserted above, with the consistent purpose and effect of financing and growing FDG's empire with the funds fraudulently misappropriated from Ziegler and Denkewalter (as also alleged above), comprises a pattern of racketeering activity giving rise to civil liability under the Racketeer Influenced and Corrupt Organizations Act, at 18 U.S.C. § 1962 ("RICO"), entitling Denkewalter to a trebling of his damages incurred under Count II hereof, a constructive trust upon business interests procured or enhanced via proceeds of the sums diverted from Denkewalter, and an award of attorneys' fees, under 18 U.S.C. § 1964(a) and (c) and other applicable law.

ANSWER: Defendants denies the legal conclusions set forth in paragraph 77.

78.     The above-recited frauds were in pursuit of a common plan made among Thomas, Olswang, and the Defendant companies they controlled which benefitted therefrom.[4]

ANSWER: Defendants denies the allegations set forth in paragraph 78.

79.     The Defendants' use of fraudulently obtained or diverted assets as the means for running and growing their business is precisely what civil RICO is intended to redress, and these offenses have been shown to be part of the FDG companies' regular way of doing business as ongoing entities.

ANSWER: Defendants denies the legal conclusions set forth in paragraph 79.

WHEREFORE, Certain Defendants request judgment against the Plaintiff costs of suit;

and such other relief as is just.

## AFFIRMATIVE DEFENSES

## FACTS COMMON TO ALL AFFIRMATIVE DEFENSES

1.    Denkewalter was a member and partner with Thomas and Olswang in Freedom Development, LLC. (hereinafter referred to as "FDG").

2.    In additional Denkewalter was member and partner with Thomas and Olswang in many of the other LLCs named as Defendants herein.

3.    Denkewalter is an attorney licensed to practice law in the State of Illinois.

4.    It was agreed among the parties hereto that Denkewalter would do legal work for the Defendants.

5.    Denkewalter gave Defendants an invoice claiming he was due $322,909.41, which did not include $60,000.00 already paid to him.

6.    On or about September 13, 2018, Denkewalter entered into a written agreement with FDG, a copy of which is attached hereto as Exhibit A.

7.    By the terms of the agreement, Denkewalter agreed to sell his interests in FDG and the other LLCs in which he had an interest to FDG.

8.    Except Denkewalter was to retain a 2% membership interest in FDG, selling his other 25% interest.

9.    By the terms of the agreement, Denkewalter was to receive the compensation set forth on Exhibit A to the agreement, also attached hereto as part of Exhibit A.

10.    The amount of compensation to Denkewalter was calculated to include

25

paying him for the legal work he had done for the Defendants.

11. The majority of the compensation to be paid to Denkewalter by the terms of the agreement, was for his alleged legal work done for the Defendants.

12. Subsequent to the execution of the Parties Agreement, Defendants learned of Denkewalter's fraudulent conduct: (a) Denkewalter had inflated the hours he had charged the Defendants; and (2) Denkewalter double-billed for his legal work both to Defendants and parties on the other side of Defendants' transactions for whom he also represented, including, Mike Ziegler.

## FIRST AFFIRMATIVE DEFENSE

13. Certain Defendants incorporates here by this reference paragraphs 1 through 12, above.

14. The Agreement (Exhibit A) is void due to Certain Defendants having entered into the Agreement due to Denkewalter's fraudulent conduct.

WHEREFORE, Certain Defendants request judgment against the Plaintiff costs of suit; and such other relief as is just.

## SECOND AFFIRMATIVE DEFENSE

15. Certain Defendants incorporates here by this reference paragraphs 1 through 14, above.

16. As a condition precedent to the agreement, Denkewalter was to assign his real estate license to Star Real Estate LLC., which he breached the agreement by not doing.

17. Due to Denkewalter's breach of condition precedent, he is barred and estopped from enforcing the agreement.

26

WHEREFORE, Certain Defendants request judgment against the Plaintiff costs of suit; and such other relief as is just.

## THIRD AFFIRMATIVE DEFENSE

## (ALTERNATIVELY PLEAD TO SECOND AFFIRMATIVE DEFENSE)

18. Certain Defendants incorporates here by this reference paragraphs 1 through 17, above.

19. Denkewalter entered into an oral agreement with FDG and Thomas prior to the execution of the written agreement, Exhibit A.

20. By the terms of the oral agreement, Denkewalter agreed to assign his real estate license to Star Real Estate LLC. ("Star").

21. Denkewalter breached is oral agreement by not assigning his real estate license to Star.

22. FDG and Thomas fully performed their obligation required by the terms of the oral agreement, which was to execute the written agreement, Exhibit A.

23. Due to Denkewalter's breach of his oral agreement, FDG and Thomas have suffered damages in the amount of $35,000,000.00, which is the reasonable amount Counter-Plaintiffs would have made in 1 year, if Star had received Denkewalter's real estate license.

24. Any amount Defendants owe Plaintiff is set off against the larger amount Denkewalter owes FDG and Thomas by the breach of his oral agreement.

WHEREFORE, Certain Defendants request judgment against the Plaintiff costs of suit; and such other relief as is just.

## CERTAIN DEFENDANTS' COUNTERCLAIM

Now Come the Defendants/Counter-Plaintiffs, Freedom Development Group, LLC. and John Thomas, by and through their attorney, Christopher A. Hansen, and for their Counterclaim against Plaintiff/Counter-Defendant Robert Denkewalter as Executor for Kim Denkewalter, deceased state as follows:

1. This Court has jurisdiction over this counterclaim pursuant to Fed. Rule Civ. Proc. 12.

### Identities of the Parties

2. Robert Denkewalter as Executor for KIM DENKEWALTER, deceased ("Denkewalter") was at all relevant times, and is currently, a resident of the City of Wheeling, in Cook County, Illinois, and is licensed to practice law in Illinois.

3. JOHN EVERETT THOMAS ("Thomas") was at all relevant times, and is presently, a resident of the State of Illinois, County of Cook.

4. Star Real Estate LLC is an Illinois and is 70% owned by Cast Iron Trust, which is owned 70% by Thomas through Cast Iron Trust.

5. FREEDOM DEVELOPMENT GROUP, LLC ("FDG") is at all relevant times, a company formed under the laws of the State of Illinois.

## COUNT I
## FRAUD

6. Denkewalter was a member and partner with Thomas and Olswang in Freedom Development, LLC. (hereinafter referred to as "FDG").

7. In additional Denkewalter was member and partner with Thomas and Olswang in many of the other LLCs named as Defendants/Counter-Plaintiffs herein.

8. Denkewalter is an attorney licensed to practice law in the State of Illinois.

9. It was agreed among the parties hereto that Denkewalter would do legal work

for the Defendants/Counter-Plaintiffs.

10.     On or about September 13, 2018, Denkewalter entered into a written agreement with FDG, a copy of which is attached hereto as Exhibit A.

11.   By the terms of the agreement, Denkewalter agreed to sell his interests in FDG and the other LLCs in which he had an interest to FDG.

12.   Except Denkewalter was to retain a 2% membership interest in FDG, selling his other 25% interest.

13.   By the terms of the agreement, Denkewalter was to receive the compensation set forth on Exhibit A to the agreement, also attached hereto as part of Exhibit A.

14.     The amount of compensation to Denkewalter was calculated to include paying for the legal work he had done for the Defendants/Counter-Plaintiffs.

15.     The majority of the compensation to be paid to Denkewalter was for his alleged legal work done for the Defendants/Counter-Plaintiffs.

16.     Subsequent to entering into the agreement, Exhibit A, Counter-Plaintiffs learned Denkewalter had fraudulently misrepresented the attorneys' fees he was charging Counter-Plaintiffs, for he had already charged other clients, including Ziegler for his services.

17.     Denkewalter was double billing his other clients and Counter-Plaintiffs for the same alleged legal work.

18.     Counter-Plaintiffs reasonably relied upon Denkewalter's fraudulent misrepresentations that he had not been paid for his services and this reliance resulted in

29

FDG entering into the agreement with Denkewalter.

19. Denkewalter's misrepresentations were done intentionally to induce Counter-Plaintiffs to enter into the agreement, Exhibit A.

20. Counter-Plaintiffs have suffered damages as a result of Denkewalter's fraudulent misrepresentations, of an amount in excess of $50,000.00., which include the agreement to pay Denkewalter the amounts set forth in the Agreement and the costs of defending this lawsuit.

WHEREFORE, FDG and Thomas pray for judgment in their favor and against Counter-Defendant Denkewalter in an amount in excess of $50,000.00 to be proven at trial and the costs of suit; and such other relief as is just.

## COUNT II
## BREACH OF ORAL AGREEMENT WITH FDG ,THOMAS, STAR

21. Certain Defendants incorporates here by this reference paragraphs 1 through 20, above.

22. Denkewalter entered into an oral agreement with FDG Thomas, and Star prior to the execution of the written agreement, Exhibit A.

23. By the terms of the oral agreement, Denkewalter agreed to assign his real estate license to Star Real Estate LLC. ("Star").

24. Denkewalter breached is oral agreement by not assigning his real estate license to Star.

25. FDG, Thomas, and Star fully performed their obligation required by the terms of the oral agreement, which was to execute the written agreement, Exhibit A.

26. Due to Denkewalter's breach of his oral agreement, FDG, Thomas, and Star have suffered damages in the amount of $35,000,000.00, which is the reasonable amount Counter-Plaintiffs would have made in 1 year, if Star had received Denkewalter's real estate

30

license.

WHEREFORE, Certain Defendants FDG, Thomas, and Star pray for judgment against Robert Denkewalter as Executor for Kim Denkewalter in the amount of $35,000,000.00, plus their costs and expenses, including attorneys' fees, and such other and further relief as this Court deems just. judgment against the Plaintiff costs of suit; and such other relief as is just.

Respectfully Submitted

By: /s/ Christopher A. Hansen
    Their Attorney

Christopher A. Hansen
hansenlegal@yahoo.com
Attorney Id: 3121774
400 S. Green St. Ste H
Chicago, IL 60607
708-284-6502


CERTAIN DEFENDANTS/COUNTER-PLAINTIFFS  DEMAND TRIAL BY 12-PERSON JURY ON ALL MATTERS HEREIN.


Dated: December 12, 2024                    CERTAIN DEFENDANTS
                                            COUNTER-PLAINTIFFS
                                            BY: /s/ Christopher A. Hansen
                                            Their Attorney


Christopher A. Hansen
hansenlegal@yahoo.com
Attorney Id: 3121774
815 W. Van Buren St. Ste. 520
Chicago, IL 60607
708-284-6502
Attorney for Certain Defendants

31

**CERTIFICATE OF SERVICE**

I, Christopher A Hansen, an attorney, hereby certify that a true and accurate copy of this document therein  referred were served upon the below named counsel by electronic mail, before the hour of   4:00 p.m. on this 9tht day of December, 2024.

/s/ Christopher A. Hansen

Christopher A. Hansen

**Service List**

Gregg Minkow
1234 N. Wacker Dr., Ste. 250
Chicago, Il. 60606
Email: gminkow@minkowbergman.com

EXHIBIT A

Case: 1:20-cv-05013 Document #: 33-1 Filed: 02/04/21 Page 109 of 129 PageID #:978

MEMBERSHIP PURCHASE AGREEMENT

This Purchase Agreement is entered into on September 17, 2018, between Kim Denkewaller, (the "Seller"), and Freedom Development Group, LLC, an Illinois limited liability company (the "Buyer").

RECITALS

A. Seller is a member in Freedom Development Group, LLC, an Illinois limited liability company and its various related LLC's established pursuant to Company's series of LLCs (the "Company"); and

B. The business and affairs of the Company are governed by an Operating Agreement dated _____ made between the members of the Company (the "Operating Agreement"); and

C. Seller owns a 27% membership interest in the Company but is Selling to Buyer 25% of the 27% so that Seller retains a 2% Membership interest in Buyer. (the "Membership Interest");

D. Seller also owns interests in other LLCs established in connection with FDG. All of Seller's interests in other FDG LLCs are included in this sale.

E. Buyer is purchasing Membership Interest in accordance with the terms of this Agreement.

In consideration of the mutual promises, representations, warranties, and covenants contained in this Agreement, the Parties agree as follows:

1.      Purchase and Sale of Membership Interest.  Subject to the terms and conditions of this Agreement, Buyer agrees to purchase from Seller, and Seller agrees to sell to Buyer, Seller's Membership Interest in the Company. In consideration thereof, Buyer agrees to pay to as set forth on Exhibit A attached hereto.

2.      Representations and Warranties of Seller.  Seller represents and warrants to Buyer as of the date of this Agreement and as of the Closing that:

a)      Seller has full power and authority to execute and deliver this Agreement and to perform Seller's obligations under it, and that this Agreement constitutes the valid and legally binding obligation of Seller, enforceable in accordance with its terms and consideration.

b)      Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by it will constitute a default under or require any notice under any agreement other than the Operating Agreement to which Seller is a party or by which Seller is bound.

c)    Seller holds of record, and owns beneficially, the Membership Interest, free and clear of any restrictions on transfer (other than any restrictions under the Operating Agreement or applicable law), taxes, security interests, options, warrants, purchase rights, contracts, commitments, equities, claims, or demands.

3.    Representation and Warranties of Buyer.  Buyer represents and warrants to Seller as of the date of this Agreement and as of the Closing that:

a)    Buyer has full power and authority to execute and deliver this Agreement and to perform Buyer's obligations under it, and that this Agreement constitutes the valid and legally binding obligation of Buyer, enforceable in accordance with its terms and consideration.

b)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will constitute a default under or require any notice under any agreement to which Buyer is a party or by which Buyer is bound.

4.    Closing Covenants and Conditions.  Each of the Parties will use their reasonable best efforts to take all actions and to do all things necessary to consummate and make effective the transactions contemplated by this Agreement.

The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to satisfaction of the following conditions:

a)    The representations and warranties made by Seller in this Agreement are correct in all material respects at the Closing;

b)    Seller has performed and complied with all of Seller's covenants made in this Agreement in all material respects at the Closing; and

c)    There shall not be any injunction, judgment, order, decree, ruling, charge, or matter in effect that prevents or may prevent consummation of any of the transactions contemplated by this Agreement; and

5.    "As-Is" Sale.  Except for the warranties given by Seller in Paragraph 2 of this Agreement, Seller has not made and is not giving Buyer any representation or warranty of any kind whatsoever with respect to the Membership Interest, the Company, or any of the business and properties of the Company, and Buyer assumes any and all of the risks associated therewith.

6.    Terms of Operating Agreement.  From and after Closing and at all times that Buyer is a member of the Company, Buyer shall be bound by all of the terms and conditions of the Operating Agreement.

7.    Nonassignability.  This Agreement shall not be assignable by any Party without the prior written consent of the other Party.

8.   Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

9.   Entire Agreement.  This Agreement, including any attached exhibits, embodies the entire agreement and understanding of the Parties with respect to its subject matter and supersedes all prior discussions, agreements, and undertakings between the Parties.

The parties have executed this Agreement on the intended dates shown.

KIM DENICE WALTER:

_[signature]_

FREEDOM DEVELOPMENT GROUP, LLC

By: _[signature]_
Name: _[handwritten]_
Title: _[handwritten]_

8.    Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

9.    Entire Agreement.  This Agreement, including any attached exhibits, embodies the entire agreement and understanding of the Parties with respect to its subject matter and supersedes all prior discussions, agreements, and undertakings between the Parties.

*10. *

The parties have executed this Agreement on the date listed on the first page.

KIM DENKEWALTER

FREEDOM DEVELOPMENT GROUP, LLC

By: _____
Name: _____
Title: _____

*\* Buyer currently owes Seller attorneys fees which will be paid from the monies due on Exhibit A,* KRD

KRD

Case: 1:20-cv-05013 Document #: 33-1 Filed: 02/04/21 Page 113 of 129 PageID #:982

# Exhibit A

1. $50,000.00 paid prior to signing of this Agreement on September 7, 2018.

2. $500,000.00 to be paid upon the Sale of the Ecolab and Capital City Parking Ramp both located in St. Paul, MN. Seller shall receive $250,000.00 from each Sale for a total of $500,000.00

3. $250,000.00 upon Buyer's next capital event or by no later than March 31, 2019 should no capital event for thereto.

4. $5000,000.00 from the proceeds from Sale of Capital City Parking Ramp in St. Paul, MN shall be wired directly to Denkewalter & Angelo's Client Trust Account for the benefit of Mike Ziegler.

5. The Operating Agreement for Star Real Estate, LLC shall be amended to provide the following percentage interests: Kim Denkewalter 30%; Cast Iron Trust and Daniel Olswang shall retain the remaining 70%.

6. Seller to receive two and one-half percent (2.5%) of Buyer's ownership interest in Questar, Inc. provided said transaction is closed by Buyer.